

# ORIGINAL

### IN THE COURT OF COMMON PLEAS
### HAMILTON COUNTY, OHIO
### CIVIL DIVISION

**LYNDSAY E ALEXANDER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MELISSA BOYER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RICHARD BRIGGS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**AMY BURROWS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**NATALIE CUNNINGHAM**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**EMILY DOWDEN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JAMIE DOWNTON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**PLAINTIFFS**

**CASE NO. A 2 1 0 2 9 6 7**

**JUDGE:**

**VERIFIED CLASS ACTION**
**COMPLAINT AND JURY TRIAL**
**DEMAND**



D132759827 1NI



VERIFY RECORD

1

KIMBERLY DUTZE
5247 MADISON PIKE
INDEPENDENCE, KY 41051

AND

DANIELLE FORMAN
5247 MADISON PIKE
INDEPENDENCE, KY 41051

AND

SHAWNA FREIBERGER
5247 MADISON PIKE
INDEPENDENCE, KY 41051

AND

RACHEL FREIER
5247 MADISON PIKE
INDEPENDENCE, KY 41051

AND

SHANNON FREY
5247 MADISON PIKE
INDEPENDENCE, KY 41051

AND

SHELLEY HAAS
5247 MADISON PIKE
INDEPENDENCE, KY 41051

AND

CAROLYN HANSFORD
5247 MADISON PIKE
INDEPENDENCE, KY 41051

AND

JOYCE LIFE-ISHMAEL
5247 MADISON PIKE
INDEPENDENCE, KY 41051

2

AND

**CHERYL MACKLIN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**TRACY MALLERY**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**DAWN MALONE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**KARYN MANTER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**SHANNON OSTERFELD**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**JENNIFER PHILLIPS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**MICHAEL SAAL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**EDWARD SIZEMORE**
**5247 MADISON PIKE**

INDEPENDENCE, KY 41051

AND

**SUZANNE THOMAS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**BRENDALEE TRAVIS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**THOMAS WRIGHT**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

AND

**MARK YOUNG**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**v.**

**CINCINNATI CHILDREN'S**                    **DEFENDANTS**
**HOSPITAL MEDICAL CENTER**
**3333 Burnet Avenue**
**Cincinnati, OH 45229**

**Serve:  Frank C. Woodside III**
**1900 Chemed Center**
**Cincinnati, OH 45202**             REGULAR MAIL WAIVER
**(Serve via Certified mail)**


Plaintiffs, all of them, individually and for all others similarly situated, by and through

counsel, and for their *Verified Class Action Complaint and Jury Demand* (the "Complaint")

against defendant Children's Hospital states as follows:

4

## INTRODUCTORY STATEMENT

This lawsuit is about "life, liberty and the pursuit of happiness" for healthcare workers, who one year ago were repeatedly referenced as essential heroes.

This lawsuit is about government control over the entire healthcare system and whether or not the government can avoid constitutional protections by acting through non-profit hospitals.

This lawsuit is about a criminal conspiracy between the government, the pharmaceutical industry and hospital systems.

This lawsuit is about a criminal conspiracy between hospitals and their physician-owned physician groups.

This lawsuit is about whether or not in the United States of America we have reached a point where Americans must choose between taking a dangerous unknown vaccine or lose not just their jobs, but their lifelong careers.

Cincinnati Children's will improve child health and transform delivery of care through fully integrated, globally recognized research, education and innovation.

For patients from our community, the nation and the world, the care we provide will achieve the best:

- Medical and quality-of-life outcomes
- Patient and family experience
- Value

today and in the future.

The facts which follow establishes this Children's Hospital mission statement only applies to the healthcare workers, not the Board and management. They deserve no respect, only scorn for what they are doing to their healthcare workers.

## VERIFIED CLASS ACTION COMPLAINT & JURY TRIAL DEMAND ENDORSED

The Plaintiffs, all of them, for their Complaint for Equitable Relief and Money Damages with Jury Trial Endorsed Hereon (the "Complaint") against defendant Children's Hospital Medical Center, Inc., ("Children's").

## THE PARTIES, JURISDICTION, AND VENUE

1. At all times relevant, Plaintiffs were residents of and domiciled in the Commonwealth of Kentucky, Ohio and Indiana. We are using the law firm's address for their privacy. This action seeks equitable relief and damages in excess of jurisdiction of the Court.

2. At all times relevant, defendant Children's, was a hospital authorized to provide medical services in return for revenues in the State of Ohio at its principal place of business located at 3333 Burnet Avenue, Cincinnati, OH 45229.

3. This Court has subject matter jurisdiction over plaintiff's claims and causes of action asserted against defendants and in personal jurisdiction over each defendant.

4. Venue of this action is proper in Hamilton County, Ohio as to Children's because Children's is an Ohio non-profit foreign corporation and its respective offices or places of business are situated in Hamilton County. Many of the acts and omissions complained of by Plaintiffs occurred in Hamilton County.

## FOLLOWING BACKGROUND SECTIONS

5. Several sections follow which are important to give context to the specific allegations and claims. This includes the main one: what is going on in the country with Covid and the vaccine is a criminal fraud.

## BASIC CORONAVIRUS CHRONOLOGY

6. At the end of 2019, rumors of a novel Corona Virus in China begin to emerge.

7. On January 17, 2020, travel restrictions were put in place by the Trump Administration.

8. On January 21, 2020, the first case of Covid-19 was reported.

9. On January 28, 2020, The World Health Organization (WHO) praised China for its "speed and openness" with the virus.

10. On January 30, 2020, The World Health Organization (WHO) declared a global health emergency.

11. On January 31, 2020, Trump issued a travel ban on China.

12. On February 5, 2020, Dr. Fauci wrote that store-bought masks are not effective against Covid.

13. On February 18, 2020, the CDC reaffirmed that the "risk to Americans from coronavirus is low".

14. In late February 2020, Nancy Pelosi visits China Town and encourages people to gather in groups. Nancy Pelosi said," That's what we're trying to do today is say everything is fine here. Come because precautions have been taken. The city is on top of the situation".

15. On March 8, 2020, Dr. Fauci describes lockdown measures in China as "draconian" and stated that such restrictions wouldn't be "feasible" in the U.S. Additionally, Fauci tells 60 Minutes. "There's no reason to be walking around with a mask."

16. On March 11, 2020, The World Health Organization (WHO) declares the outbreak a pandemic. They are the ones who declared it a pandemic and everyone in the world just accepted it as such.

17. On March 15, 2020, Dr. Fauci flips on previous statement and says he would be open to a 14-day shutdown to stop the spread of Coronavirus.

18. On March 18, 2020, Joe Biden suggests in a tweet that Trump is "xenophobic fear-mongering" for his China travel ban.

19. On March 20, 2020, two-week lockdowns started going into effect around the United States. These lockdowns continued throughout the entire year of 2020, resulting in massive unemployment, businesses going out of business and trillions in government borrowing.

20. On March 30, 2020, churches began to be shut down throughout the country.

21. In May 2020, Kentucky Governor Andy Beshear banned mass gatherings and church services. However, a federal judge halted Beshear's bans on church services.

22. In May 2020, Trump stated he can have a vaccine ready by the end of the year.

23. On May 25, 2020, George Floyd dies while being arrested.

24. In the summer months of 2020, there are massive violent protests, riots, and gatherings across the U.S. by the political left amidst the pandemic. The media and Democrat concerns about spreading covid disappears.

25. In October 2020, Kamala Harris says during the Presidential Debates that she won't take the vaccine if Donald Trump tells us we should take it.

26. In November 2020, Moderna and Pfizer's vaccine readiness is announced shortly **after** the November election.

27. On November 17, 2020, Dr. Fauci "flips" and he recommends the "uniform wearing of masks" to help curb the surge of coronavirus in the United States.

28. In January 2021, Joe Biden takes credit in distributing the vaccine out to Americans. Additionally, Joe Biden mandates masks.

29. In May 2021, the CDC lifts mask and social gathering restrictions for the vaccinated. CDC statement: "The science is clear; If you are fully vaccinated, you are protected, and you can start doing the things that you stopped doing because of the pandemic". Additionally, Dr. Fauci said," [it] is a very important step in the direction of trying to get back to some degree of normality, because this is something that everyone has had on their mind".

30. In July 2021, the CDC reverses indoor mask policy, saying that fully vaccinated people and kids should wear them indoors.

31. In August 2021, the Biden Administration looks to mandate vaccinations. Additionally, many employers and even cities start requiring mandatory vaccinations.

32. In August 2021, the government wants everyone to be vaccinated, everyone to wear masks and everyone to social distance… all at once.

33. By August 2021, it begins to be clear that China and the Wuhan Lab IS the source of the Covid virus.

34. All of the above leads half the American public to not trust the federal government, the media and Dr. Fauci.

### HISTORY OF PHARMACEUTICAL INDUSTRY LYING TO THE AMERICAN PUBLIC

35. Elixir Sulfanilamide Mass Poisoning – United States (1937)- Over 100 people were poisoned and died when sulfanilamide, an antibiotic, was dissolved in diethylene glycol

(DEG) and marketed as Elixir Sulfanilamide. Everyone, including the chief pharmacist developing the antibiotic, was oblivious to its potential lethality.

36. Thalidomide Birth Defects Scandal – Germany and Worldwide (1950s–1960s)- Thalidomide, a sedative also used to treat morning sickness in expecting mothers, which was referred to as a "wonder drug", "unexpectedly" was found to be capable of interfering with developing fetuses and to cause birth defects.

37. Tainted Vaccine Research 2004 Andrew Wakefield- Andrew Wakefield, the doctor who champions the alleged link between measles, mumps and rubella vaccine and autism in young children, stands discredited for misleading his medical colleagues and The Lancet, the professional journal that published his findings. The investigation has found that when he warned parents to avoid MMR, and published research claiming a link with autism, he did not disclose he was being funded through solicitors seeking evidence to use against vaccine manufacturers.

38. Heparin Adulteration – China (2008)- 81 deaths and 785 other reports of severe injuries were linked to the drug Heparin as a result of contaminated batches of the drug being sold in the U.S. Worryingly, the FDA also stated that it does not have enough money and that it is not up to them to inspect such overseas manufacturers on a regular basis.

39. Medical Company Price Fixing 2008- Adcock Ingram, the leading supplier of hospital products in the country, teamed up with its competitors - Dismed Criticare, Thusanong Health Care and Fresenius Kabi South Africa - to rig government tenders worth hundreds of millions.

40. New England Compounding Center Meningitis Outbreak – United States (2012)-
    Unhygienic conditions at the New England Compounding Center (NECC) led to 44
    deaths as a result of them contracting meningitis from tainted epidural steroid injections.

41. DES was declared safe for 1960's expecting mothers for morning sickness. It resulted in
    massive birth defects.

42. Despite this track record, the American public is being asked to trust the pharmaceutical
    industry.

**HISTORY OF THE AMERICAN MEDIA LYING TO THE AMERICAN PUBLIC**

43. Trump colluded with Russia to win in 2016 and Trump might be a Russian agent. That
    scam involved crooked FBI agents and let to the appointment of special counsel Robert
    Mueller, who took two years to conclude there was no evidence to back the charge.
    Report on Investigation into Russian Interference in 2016 election- lead investigator
    Robert Mueller, released to public by DOJ April 18, 2019.

44. The whole narrative about the Russians interfering in the 2016 presidential election and
    the election integrity of 2016 was to be questioned, but then 2020 rolls around, and since
    Biden won, it was unanimously agreed that there was no such interference in the election,
    from either a foreign or domestic infiltrator. It was spouted that the integrity of the 2020
    election should not be questioned, despite there being blatantly clear evidence that,
    regardless of its magnitude, there were instances of fraudulent voting practices.

45. The "Muslim ban". Mainstream media twisted the country-specific bans to combat
    radical Islam as being characterized as a "muslim ban". Ironically, most of the countries
    that were on this list were the same countries that were singled out by the Obama
    Administration as being dangerous and a security threat.

46. The lie that the Trump Administration was putting children in "cages", despite the fact that these "cages" were built during the Obama Administration.

47. Despite this track record and countless other examples, the media expects the American public to do what the media tells them to do.

## TOBACCO COMPANIES LYING TO THE AMERICAN PUBLIC

48. In her 1,683-page opinion for the court decision, U.S. District Judge Gladys Kessler documented the many times tobacco companies have lied about the harmful effects of cigarettes and manipulated the public.

49. Tobacco companies falsely denied that they can and do manipulate the level of nicotine in their products to create and sustain addiction and have been since at least 1954. In 1994, the CEO of R.J. Reynolds testified in a public hearing held by Congress that the company does not "add, or otherwise manipulate nicotine to addict smokers" or "do anything to hook smokers or to keep them hooked." At the same public hearing, chairman and CEO of Lorillard testified that "Nicotine levels … are not raised or reduced for particular brands."

50. Tobacco companies "falsely denied, distorted and minimized" the link between cigarette smoking and disease, even though they internally recognized its existence. The 1964 Surgeon General's report concluded that smoking cigarettes causes death and disease. However, in a 1971 television interview, the president of Philip Morris denied the health risks that pregnant women and their babies face, saying that "It's true that babies born from women who smoke are smaller, but they are just as healthy as the babies born to women who do not smoke. Some women would prefer to have smaller babies."

51. Tobacco companies concealed evidence and publicly denied that nicotine is addictive. In 1982, the National Institute of Drug Abuse confirmed that nicotine is addictive. A 1994 R.J. Reynolds document, called "Media Tips," stated that "Regardless of how you define addiction, cigarettes are clearly not in the same class as addictive, mind-altering drugs like heroin and cocaine." In a 1997 issue of Time magazine, the president and CEO of Philip Morris was quoted as saying "If [cigarettes] are behaviorally addictive or habit forming, they are much more like ... GummiBears, and I eat Gummi Bears, and I don't like it when I don't eat my Gummi Bears, but I'm certainly not addicted to them."

52. Tobacco companies "falsely marketed and promoted low-tar and light cigarettes as less harmful" than regular cigarettes to keep people smoking and sustain revenues. Research has proven that there is no safe cigarette and all cigarettes cause cancer, lung disease, heart attacks and premature death. A 1964 Lorillard memorandum admitted that "KENT was marketed as a 'safer' cigarette for the smoker who was concerned about smoking and health. In 1956 when an innocent third party (Reader's Digest) created an awareness to the consumer that KENT was the 'safest' of all popular cigarettes, Lorillard exploited this advantage so that within a short period of two years the KENT volume grew from less than four billion cigarettes to thirty-eight billion annually."

53. Tobacco companies internally acknowledged that secondhand smoke is hazardous to nonsmokers, yet still gave false and misleading public statements denying the fact. The industry also tried to undermine and discredit the evidence in the 1986 Surgeon General's report, which concluded that exposure to secondhand smoke is a health hazard to nonsmokers and causes disease and respiratory problems. In 1987, Philip Morris released a series of advertisements that pictured smokers "talking" to the reader, with statements

13

like "Please don't tell me my cigarette smoke is harmful to you. There's just no convincing proof that it is." and "I know there's no proof my smoke can hurt you."

### CORPORATE AMERICA LYING TO AMERICA

54. With there being countless daily examples supported by SEC charges, we will simply state that corporate American has a long history of lying to the American public.

### HISTORY OF AMERICAN HOSPITALS LYING TO THE AMERICAN PUBLIC

55. One of the most outrageous practices in medicine is when an institution gives advice based on money and not on health, such as prescribing a certain drug because the manufacturer pays you a kickback. A similar case unfolded in 2006 at the University of Medicine and Dentistry of New Jersey. It turns out that the school has been paying kickbacks to doctors in exchange for the doctors agreeing to refer heart patients to the school.

56. Over the past 20 years, the price of U.S. hospital services has increased by more than 200%.

57. Hospital Corporation of America (HCA) owns and operates 162 hospitals and 113 surgery facilities, the majority of which are located in the US. In 1997, an investigation uncovered startling amounts of upcoding, kickbacks, and record falsification. In 2002, HCA settled for over $2 Billion, and it was decided that HCA would remain in an 8-year federal Corporate Integrity Agreement. In 2004, it was discovered that nearly half of all cardiovascular stents being implanted at a Florida hospital under HCA's management was needlessly and fraudulently installing the devices. In 2010, an internal whistleblower disclosed that over the course of eight years, there were over 1,200 procedures done which were medically unnecessary. In 2015, yet another whistleblower disclosed that

unnecessary procedures were continuing to happen, and that a hospital in the HCA network was double billing.

58. There have been several cases across the U.S. where cardiologists performed unnecessary heart problems.

59. In January, a federal jury found a Texas rheumatologist guilty of falsely diagnosing patients with life-long diseases – and treating them with medically unnecessary and toxic medications – as part of a $325 million healthcare fraud scheme.

60. A federal judge found four Detroit, Michigan-area doctors guilty for participating in a Medicare fraud scheme that cost the federal healthcare program $150 million.

61. A doctor in Michigan treated patients for cancer who didn't even have cancer.

62. The AHA and other hospital groups called on the Justice Department to stop imposing penalties on providers whose coronavirus-related remuneration violate healthcare fraud laws during Covid 19 crisis.

63. **From 2005 to 2013, nearly every Cincinnati area hospital knowingly allowed Dr. Atiq Durrani to perform unnecessary spine surgeries on adults and children for because of the projects those procedures generated.  These included:  Children's, Christ, Good Samaritan, Jewish, Deaconess, Journey Lite, UC Health and Riverview in Dayton.**

## HISTORY OF LIES TOLD BY FORMER PRESIDENTS & THEIR ADMINISTRATIONS

64. Barack Obama's "If you like your health-care plan, you'll be able to keep your health-care plan."  This was not true.

65. Lies to avoid embarrassment: John F. Kennedy denied he had Addison's disease.

66. Bill Clinton's denied that he had an affair with Monica Lewinsky.

67. There have been lies to cover up important crimes—such as the Watergate scandal—and lies of policy deception: Lyndon B. Johnson lying about the progress of Vietnam, Richard Nixon hiding the secret bombing of Cambodia and Ronald Reagan denying the Iran-Contra scandal.

68. Eisenhower's presidency denied that U-2 spy planes were flying over the Soviet Union when, in fact, they were. In 1960, when the USSR shot down an American plane and captured its pilot, President Eisenhower had to admit that the CIA had been flying spy missions of the USSR for years.

69. In 1919, President Woodrow Wilson suffered from a massive stroke, so the first lady, Edith Wilson, began making decisions on his behalf. She prevented news of the seriousness of Wilson's condition from getting out to the public. To prevent her husband from resigning, Edith became the de facto president. Historians estimate that she led the country for a year and five months.

70. In the 1950s, the CIA experimented with mind control on unknowing citizens with a top-secret CIA program called MK-Ultra. "Precautions must be taken not only to protect operations from exposure to enemy forces but also to conceal these activities from the American public in general," wrote the CIA's Inspector General in 1957.

71. In August 1964, the United States entered the Vietnam War after reports of an unprovoked attack in the Gulf of Tonkin. In the early 2000s, nearly 200 documents were declassified and released by the National Security Agency. They showed that there was no attack on August 4.- U.S. officials had distorted the truth about the Gulf of Tonkin incident for their own gains — and perhaps for Johnson's own political prospects.

72. In October 2002, Bush said that Saddam Hussein had a "massive stockpile" of biological weapons. But as CIA Director George Tenet noted in early 2004, the CIA had informed policymakers it had "no specific information on the types or quantities of weapons agent or stockpiles at Baghdad's disposal." The "massive stockpile" was just literally made up.

73. IRS Commissioner Douglas Shulman told Congress in March 2012 that the IRS was not targeting groups based on politics. "There's absolutely no targeting." Shulman told a House Ways and Means subcommittee. The Internal Revenue Service apologized in May of 2013 for what it acknowledged was "inappropriate" targeting of conservative political groups during the 2012 election.

74. As part of Operation Fast and Furious, ATF allowed 1,961 guns to "walk" out of the U.S. in an effort to identify the high-profile cartel leaders who received them. The agency eventually lost track of the weapons, and they often ended up in the hands of Mexican hit men. The House voted to hold Attorney General Eric Holder in contempt of Congress over his failure to turn over documents related to the Fast and Furious scandal, the first time Congress has taken such a dramatic move against a sitting Cabinet official.

75. Seven years after the former National Security Agency contractor Edward Snowden blew the whistle on the mass surveillance of Americans' telephone records, an appeals court has found the program was unlawful – and that the US intelligence leaders who publicly defended it were not telling the truth.

76. Senate Judiciary Committee Chairman Lindsey Graham (R-South Carolina) released a declassified FBI document that indicates the FBI misled the Senate Intelligence Committee in 2018 about the Steele dossier's Primary Sub-source and, therefore, the reliability of the

Steele dossier. The Steele dossier was a large contributing factor of the allegations against the Trump campaign colluding with Russia.

77. Former Director of National Intelligence James Clapper leaked classified information on Steele Dossier and lied to Congress about it. The House intelligence committee wrote that Clapper leaked details of a dossier briefing given to President-elect Donald Trump to CNN's Jake Tapper, lied to Congress about the leak, and was rewarded with a CNN contract a few months later.

78. On February 5th, 2020, Anthony Fauci privately replied to an email saying "The typical mask you buy in the drug store is not really effective in keeping out virus, which is small enough to pass through material." He later recommended "uniform wearing of masks" to help curb the surge of coronavirus cases in the United States.

79. Despite all these lies and more, the U.S. government expects the American public to trust them.

### CURRENT INCOMPETENCY OF JOE BIDEN ADMINISTRATION

80. The Biden administration in just eight months:

    A. Took an energy independent U.S. and made us energy dependent including begging OPEC to produce more oil.

    B. Took a secure border and opened it up to cartels, criminals, terrorists and countless illegal aliens.

    C. Took stable world peace and made it unstable.

    D. Created record inflation.

    E. Created record crime.

    F. Evacuated Afghanistan BEFORE removing 20,000 Americans.

18

81. The state of Ohio has been racked with corruption and scandal including the nuclear power plants scandal.

82. The city of Cincinnati has been racked with corruption and scandal.

83. The Commonwealth of Kentucky has a history of political scandal unmatched by any state.

84. Yet, Joe Biden, Mike Dewine and Andy Beshear wants us to trust them.

### THE HARM OF THE LOCKDOWNS BOTH FINANCIAL AND HEALTH

85. The government and healthcare have mismanaged the Covid issue from day one.

86. Locking down the economy didn't contain the disease's spread and reopening it didn't unleash a second wave of infections.

87. Evidence proves that lockdowns were an expensive treatment with serious side effects and no benefit to society.

88. TrendMacro, an analytics firm, tallied the cumulative number of reported cases of Covid-19 in each state and the District of Columbia as a percentage of population, based on data from state and local health departments aggregated by the Covid Tracking Project. We then compared that with the timing and intensity of the lockdown in each jurisdiction. That is measured not by the mandates put in place by government officials, but rather by observing what people in each jurisdiction actually did, along with their baseline behavior before the lockdowns. This is captured in highly detailed anonymized cellphone tracking data provided by Google and others and tabulated by the University of Maryland's Transportation Institute into a "Social Distancing Index."

89. Measuring from the start of the year to each state's point of maximum lockdown—which range from April 5 to April 18—it turns out that lockdowns correlated with a greater

spread of the virus. States with longer, stricter lockdowns also had larger Covid

outbreaks. The five places with the harshest lockdowns—the District of Columbia, New

York, Michigan, New Jersey and Massachusetts—had the heaviest caseloads.

### COVID 19 & LOCKING DOWN THE COUNTRY DETRIMENTALLY AFFECTED MENTAL HEALTH

90. Isolation/Loneliness- reported as top mental health concern

Adults:

- January to September 2020, 315,220 people took the anxiety screen, a 93 percent increase over the 2019 total number of anxiety screens. 534,784 people took the depression screen, a 62 percent increase over the 2019 total number of depression screens.

- The number of people screening with moderate to severe symptoms of depression and anxiety has continued to increase throughout 2020 and remains higher than rates prior to COVID-19. In September 2020, the rate of moderate to severe anxiety peaked, with over 8 in 10 people who took an anxiety screen scoring with moderate to severe symptoms. Over 8 in 10 people who took a depression screen have scored with symptoms of moderate to severe depression consistently since the beginning of the pandemic in March 2020.

- More people are reporting frequent thoughts of suicide and self-harm than have ever been recorded in the MHA Screening program since its launch in 2014. Since the COVID-19 pandemic began to spread rapidly in March 2020, over 178,000 people have reported frequent suicidal ideation. 37 percent of people reported having thoughts of suicide more than half or nearly every day in September 2020.

**Youth**

- Young people are struggling most with their mental health. The proportion of youth ages 11-17 who accessed screening was 9 percent higher than the average in 2019. Not only are the number of youth searching for help with their mental health increasing, but throughout the COVID-19 pandemic youth ages 11-17 have been more likely than any other age group to score for moderate to severe symptoms of anxiety and depression.

- Rates of suicidal ideation are highest among youth, especially LGBTQ+ youth. In September 2020, over half of 11-17-year-olds reported having thoughts of suicide or self-harm more than half or nearly every day of the previous two weeks. From January to September 2020, 77,470 youth reported experiencing frequent suicidal ideation, including 27,980 LGBTQ+ youth.

- 70 percent reported that one of the top three things contributing to their mental health concerns was loneliness or isolation.

### IN CONTEXT SUMMARY

91. **Based upon the chronology of the coronavirus, history of Pharma lying, history of media lying, history of hospitals lying, history of corporate America lying, the history of the government lying, the harm and incompetency of the wrong decisions by all of them, they all still expect the American public and healthcare workers to trust them. And the media and social media pound every day that to not trust, to not conform, to not do as they all say is stupidity, selfish and even murderous.**

### GOVERNMENT INVOLVEMENT IN HEALTHCARE AND DEFENDANT

92. **Exhibit 1** is the chart reflecting how Defendant and all tristate hospitals received in 2020 massive amount of money from government via the taxpayer.

21

93. The major portion of the federal government's health business is conducted through contracts and grants to states, localities, and private providers and organizations. The federal government acts through financing intergovernmental and interorganizational contracts to encourage various public health initiatives, convening participants around an issue, coordinating activities, and developing state and local provider contracts. In return for federal funds, states, localities, and private organizations must follow the federal standards and policies set in the contract. Thus in many programs, the federal government takes an oversight, policy-setting, and technical assistance role, rather than a direct provider role. Federal contracts can take the form of seed money for researching and developing new programs, such as Community Mental Health Centers, or they can be support for ongoing activities, such as the Early Periodic Screening, Detection, and Treatment Program. Contracts can be made with agencies to operate specific public health programs or to support general agency activities. Contracts can also be made with health care providers, such as nursing homes or home health agencies, for directly delivering personal health services. Contracts with local areas and providers may be operated through the states or be made directly with the local areas and private sector.

94. The federal government plays a large role in the public health system in the country. It surveys the population's health status and health needs, sets policies and standards, passes laws and regulations, supports biomedical and health services research, helps finance and sometimes delivers personal health services, provides technical assistance and resources to state and local health systems, provides protection against international health threats, and supports international efforts toward global health. The federal government does all

of these mainly through two delegated powers: the power to regulate interstate commerce and the power to tax and spend for the general welfare.

95. At present, the main federal unit with responsibility for public health is the United States Public Health Service in the Department of Health and Human Services. The second major unit is the Health Care Financing Administration, also in the Department of Health and Human Services.

96. The Secretary of the Department of Health and Human Services is chosen by the President of the United States and sits in his Cabinet.

97. The United States Public Health Service includes the (1) Centers for Disease Control; (2) the National Institutes of Health.

98. The Centers for Disease Control, the main assessment and epidemiologic unit for the nation, directly serves the population as well as providing technical assistance to states and localities. The National Center for Health Statistics within the Centers for Disease Control is the main authority for collecting, analyzing, and disseminating health data.

99. The major portion of the federal government's health business is conducted through contracts and grants to states, localities, and private providers and organizations.

100.     It should be noted that the public health system, as divided above by national, state, and local settings, is not necessarily that static. There are many channels for information and coordinated activity between national, state, and local levels in both the public and private sectors, just as there is exchange of information and coordination of activity between the health agencies, other agencies, and private actors.

101.     Hospitals can not survive with the Medicare and Medicaid payments made to them.

23

102.     **Case 1:21-cv-22440-KMN filed by Trump v. Facebook describes how the U.S. government worked with Facebook to censure and de-platform Donald Trump from Facebook.  Trump maintains the social media action is in reality government action. While true, that's not even close to how government directs hospitals.**

103.     Defendants receive the majority of their funding from the state and federal government in the form of Medicare and Medicaid payments.[1]

104.     In addition, as of May 2021, Congress had allocated $175 billion in relief for healthcare providers to help them recoup losses tied to the Covid-19 pandemic.[2]

105.     Moreover, the major portion of the federal government's health business is conducted through contracts and grants to states, localities, and private providers and organizations. The federal government acts through financing intergovernmental and interorganizational contracts to encourage various public health initiatives, convening participants around an issue, coordinating activities, and developing state and local provider contracts. In return for federal funds, states, localities, and private organizations must follow the federal standards and policies set in the contract. Thus, in many programs, the federal government takes an oversight, policy-setting, and technical assistance role, rather than a direct provider role. Federal contracts can take the form of seed money for researching and developing new programs, such as Community Mental Health Centers, or they can be support for ongoing activities, such as the Early Periodic Screening, Detection, and Treatment Program. Contracts can be made with agencies to operate specific public health programs or to support general agency activities. Contracts can also be made with

---

[1] The Nation's Health Dollar ($3.8 Trillion), Calendar Year 2019: Where It Came From (cms.gov) (last visited August 13, 2021)
[2] CARES Act Provider Relief Fund: Data | HHS.gov (last visited August 21, 2021)

health care providers, such as nursing homes or home health agencies, for directly delivering personal health services. Contracts with local areas and providers may be operated through the states or be made directly with the local areas and private sector.

## PRESIDENT BIDEN & VACCINE MANDATES

106. July 29, 2021: Quotes from video

https://www.youtube.com/watch?v=UVIXqa9Rcg0

107. "I'm calling on all states and local governments to use funding they have received, including from the American Rescue Plan, to give $100 to anyone who gets fully vaccinated" (Video time = 2:20 – 2:30)

108. "It's time to impose requirements on key groups to make sure they're vaccinated" (Video time = 2:50 – 2:57)

109. " Like what many other civilian hospitals are doing, The Department of Veterans Affairs will now require Covid-19 vaccines for Doctors and nurses and other healthcare workers who provide medical care for our veterans" (video time = 3:05 – 3:19)

110. "Next, since many vaccinations are required for active duty military today, I'm asking the Defense department to look into how and when they will add Covid-19 to the list of vaccinations our armed forces MUST GET " (video time = 3:30 – 3:45)

111. "Every federal government employee will be asked to attest to their vaccination status. Anyone who does not attest, or is not vaccinated, will require to mask, no matter where they work, test 1-2 times per week to see if they've acquired Covid, socially distance, and generally will not be allowed to travel for work. LIKEWISE, today, I am directing my administration to take steps to apply similar standards to all federal

contractors. If you want to do business with the federal government, get your workers vaccinated" (video time = 4:06 – 4:53)

112.     Biden then urges all corporations to "follow suit."

113.     On August 18, 2021, Joe Biden announced nursing homes would not receive Medicaid or Medicare reimbursement unless all employees were fully vaccinated.

114.     There is no connection between financial renumeration and patient care and safety.

115.     President Biden even publicly declared anyone who would not take the vaccine is "not as smart as I thought you were."

116.     Medicare and Medicaid have notified hospital administrators that reimbursement will be based on the number of staff vaccinated.

**117.     Based upon the above, there is no question the vaccine mandate against Plaintiffs and hospitals is a mandate which is coming from government state action. In fact, it comes directly from the mouth of Joe Biden, the President of the United States.**

### THE COVID SCIENCE

118.     **Exhibit 2** is one of Plaintiff's expert affidavits and CV in support of Plaintiffs' allegations. Page 16 of that affidavit summarizes her conclusions. She is a former Christ Hospital hematologist and oncologist.

119.     The summary Dr. Waselenko gives is as follows:

• There is a great deal of concern regarding long-term safety with this new methodology and caution should be exercised.

•Many people are being coerced into receiving an experimental gene therapy never before used in humans. This is a clear violation of the Nuremberg code.

• Many patients do not recognize that this gene vaccine is an experiment and they are not receiving appropriate informed consent including the discussion regarding no treatment or alternative treatments.

• Most patients do not need and will not benefit from the COVID-19 gene base therapies but will still incur long-term risk.

• All people have a right to decide for themselves whether they want to receive this experimental gene-based vaccine or not after appropriate inform consent.

• Mandating this experimental therapy in any child or person is wrong. Mandating the COVID-19 gene-based vaccine in frontline workers and our military is short sighted and potentially compromises our nation and our communities. These are mission critical personnel and the risking of their health in this setting is senseless and could lead to more deaths (from patients who cannot be care for) or national security issues.

• These gene-based vaccines do not protect them from getting the COVID-19 infection, transmitting the infection, or the development of resistant variants, and may put them at risk of antibody dependent enhancement or another serious vaccine associated injury.

•To mandate that children receive this experimental gene therapy is highly inappropriate, based on their negligible mortality with the coronavirus infection, low transmissibility which has been documented in children, and their long life expectancy in which they will be at high risk of future toxicity, potential infertility, and the potential risk of perpetual antibody dependent enhancement with coronavirus, influenza, or other respiratory viruses. It is my opinion that mandating that children, adolescents, or young adults receive this gene base therapy is criminal.

•Dr. Fauci, the NIAID, and others are complicit in fraud as categorically outlined by Dr. Martin

120.    By the spring of 2020, the novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, had spread across the globe. Since then, and because of the federal government's "Operation Warp Speed," three separate coronavirus vaccines have been developed and approved more swiftly than any other vaccine in our nation's history.

121.    The process for developing a vaccine normally takes place in several phases, over a period of years. The general stages of the development cycle for a vaccine are: a. Exploratory stage; b. Pre-clinical stage (animal testing); c. Clinical development (human

trials - see below); d. Regulatory review and approval; e. Manufacturing; and f. Quality control.[3]

122.     The third stage, clinical development, is itself a three-phase process: a. During Phase I small groups of people receive the trial vaccine. b. In Phase II, the clinical study is expanded, and the vaccine is given to people who have characteristics (such as age and physical health similar to those for whom the new vaccine is intended. c. In Phase III, the vaccine is given to thousands of people and tested for efficacy and safety.

123.     Phase III itself normally occurs over a course of years because it can take years for the side effects of a new vaccine to manifest themselves. Phase III must be followed by a period of regulatory review and approval. During this stage, data and outcomes are reviewed by peers and by the Food and Drug Administration ("FDA")

124.     Finally, the manufacturer must demonstrate that the vaccine can be manufactured under conditions that assure adequate quality control.

125.     The timeline set by Operation Warp Speed telescoped what would normally take years of research into a matter of months. Commercial vaccine manufacturers and other entities proceeded with the development of COVID-19 vaccine candidates using different technologies including RNA, DNA, protein, and viral vectored vaccines.

126.     FDA issued an Emergency Use Authorization ("EUA") for the PfizerBioNTech COVID-19 Vaccine ("Pfizer Vaccine") on December 11, 2020[4]. Just one week later, FDA issued a second EUA for the Moderna COVID-19 Vaccine ("Moderna Vaccine").[5] FDA

---

[3] 1 https://www.cdc.gov/vaccines/basics/test-approve.html.
[4] Pfizer-BioNtech Vaccine FAQ, FDA, bit.ly/3i4Yb4e (last visited July 28, 2021).
[5] Moderna, About Our Vaccine, bit.ly/2Vl4IUF (last visited July 28, 2021).

issued its most recent EUA for the Johnson & Johnson COVID-19 Vaccine ("Janssen Vaccine") on February 27, 2021 (the only EUA for a single-shot vaccine).[6]

127.     The EUA statute, 21 U.S.C. § 360bbb-3, explicitly states that anyone to whom the product is administered must be informed of the option to accept or to refuse it, as well as the alternatives to the product and the risks and benefits of receiving it.

128.     The experimental vaccine has been in existence for less than a year. The first reported use of the experimental vaccine was December 14, 2020. Even though the FDA granted emergency use authorization for the Pfizer/BioNTech and Moderna vaccines in December 2020, the clinical trials the FDA will rely upon to ultimately decide whether to license these and other COVID-19 experimental vaccines are still underway and are designed to last for approximately two (2) years to collect adequate data to establish if these vaccines are safe and effective enough for the FDA to approve.

129.     The abbreviated timelines for the emergency use applications and authorizations means there is much the FDA does not know about these products even as it authorizes them for emergency use, including their effectiveness against infection, death, and transmission of SARS-CoV-2, the virus that is allegedly the cause of the COVID disease, and the new so-called Delta variant in particular.

130.     Given the uncertainty about the COVID-19 experimental vaccines, the FDA requires that each dose of the experimental vaccine shall have a label that states that the product is an emergency use authorization, that the EAU is explicit that each is "an investigational vaccine not licensed for any indication" and that all "promotional material relating to the Covid-19 Vaccine clearly and conspicuously...state that this product has not

---

[6] EUA for Third COVID-19 Vaccine, FDA, bit.ly/3xc4ebk (last visited July 28, 2021

been approved or licensed by the FDA, but has been authorized for emergency use by FDA". (Exhibit "A-1", EAU letter for Pfizer).

131. The FDA on their website has stated the following: "FDA believes that terms and conditions of an EAU issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EAU was issued in the context of the emergency declared under section 564... In an emergency, it is critical that the conditions that are part of the EAU or an order or waiver issued pursuant to section 564A – those that FDA has determined to be necessary or appropriate to protect the public health-be strictly followed, and no additional conditions be imposed."

132. In August 2020, the Centers for Disease Control and Prevention ("CDC") published a meeting of the Advisory Committee on Immunizations and Respiratory Diseases, Dr. Amanda Cohn stated (@1:14:40):

   a. "I just wanted to add that, just wanted to remind everybody, that under an Emergency Use Authorization, an EAU, **vaccines are not allowed to be mandatory**. So, early in the vaccination phase, individuals will have to be consented and they won't be able to be mandated." (emphasis added).

133. Even if rare, serious complications and even death have occurred as a result of receiving these new Covid-19 vaccines. Anaphylaxis after COVID-19 vaccination has occurred in approximately 2 to 5 people per million vaccinated in the United States. Severe allergic reactions, including anaphylaxis, can occur after any vaccination. Thrombosis with thrombocytopenia syndrome ("TTS") after Janssen Vaccine is rare. As of August 6, 2021, more than 13 million doses of the Janssen Vaccine have been given in the United States.

CDC and FDA identified 39 confirmed reports of people who got the Janssen Vaccine and later developed TTS. Women younger than 50 years old especially should be aware of the rare but increased risk of this adverse event. [7]

134.     CDC and FDA are monitoring reports of Guillain-Barré Syndrome ("GBS") in people who have received the J&J/Janssen COVID-19 Vaccine. GBS is a rare disorder where the body's immune system damages nerve cells, causing muscle weakness and sometimes paralysis. Most people fully recover from GBS, but some have permanent nerve damage. After more than 13 million Janssen Vaccine doses administered, there have been around 155 preliminary reports of GBS identified in VAERS as of August 6, 2021. These cases have largely been reported about 2 weeks after vaccination and mostly in men, many 50 years and older. CDC will continue to monitor for and evaluate reports of GBS occurring after COVID-19 vaccination and will share more information as it becomes available.[8]

135.     As of August 6, 2021, the Vaccine Adverse Event Reporting Systems ("VAERS") has received 1,253 reports of myocarditis or pericarditis among people ages 30 and younger who received COVID-19 vaccine. Most cases have been reported after mRNA COVID-19 vaccination (Pfizer-BioNTech or Moderna), particularly in male adolescents and young adults. Through follow-up, including medical record reviews, CDC and FDA have confirmed 730 reports of myocarditis or pericarditis. CDC and its partners are investigating these reports to assess whether there is a relationship to COVID-19 vaccination.[9]

---

[7] Selected Adverse Events Reported after COVID-19 Vaccination | CDC (last visited August 16, 2021)

[8] *Id.*

[9] *Id.*

136.    In all, there were 6,6631 reports of deaths in the United States from December 14, 2020, through August 9, 2021.[10] By comparison, from July 1, 1997, until December 31, 2013, VAERS received 666 adult death reports.[11] The flu vaccines are linked to 20–30 death reports a year, according to Dr. Peter McCullough [12], and those 20–30 death reports come with considerably more vaccines administered.[13]

137.    The experimental SARS-CoV-2 vaccine contains laboratory synthesized mRNA in a lipid package. This mRNA enters the host's cells and hijacks the cells, causing them to produce the spike protein of the coronavirus, which elicits the development of antibodies.[14]

138.    The human host cells respond to the spike protein and elicit cell signaling. [15] The spike protein produced by the new COVID-19 experimental vaccines may also affect the host cells.[16]

139.    Scientists recommend that the long-term consequences of these experimental vaccines be monitored carefully, especially when they are administered to otherwise healthy individuals.[17] Scientists further conclude that further investigations on the effects

---

[10] *Id.*

[11] Pedro L. Moro, Jorge Arana, Mria Cano, Paige Lewis, and Tom T. Shimabukuro, Deaths Reported to the Vaccine Adverse Event Reporting System, United States, 1997-2013, VACCINES, CID 2015:61 (September 2015)

[12] Dr. McCullough is vice chief of medicine at Baylor University Medical Center and the most cited American medical doctor on COVID-19 at the National Library of Medicine.

[13] Dr. McCullough estimated the flu shot at 195 million people annually, while over 153 million have currently received COVID vaccinations. The disparity between these two vaccine groups is staggering.

[14] Suzuki YJ, Gychka SG. SARS-CoV-2 Spike Protein Elicits Cell Signaling in Human Host Cells: Implications for Possible Consequences of COVID-19 Vaccines. Vaccines (Basel). 2021;9(1):36. Published 2021 Jan 11. doi:10.3390/vaccines9010036

[15] *Id.*

[16] *Id.*

[17] *Id.*

of the SARS-CoV-2 spike protein on human cells and appropriate experimental animal models are warranted.[18]

140.     A recent study suggests that the SARS-CoV-2 spike protein can by itself trigger cell signaling that can lead to various biological processes. [19] The scientists who conducted the study concluded, "It is reasonable to assume that such events, in some cases, result in the pathogenesis of certain diseases."[20]

141.     Despite the experimental nature of the vaccine and the numerous adverse side effects related to the experimental vaccine including, but not limited to, death through anaphylactic shock[21], thrombosis with thrombocytopenia syndrome[22], blood clots, multi-system autoimmune disorders and multi-organ failure, and the fact that some scientists have concluded that it is reasonable to assume the experimental vaccine will result in the pathogenesis of certain diseases, Defendants gave employees an ultimatum - if you want

---

[18] Id. ("However, we need to consider their long-term consequences carefully, especially when they are administered to otherwise healthy individuals as well as young adults and children. In addition to evaluating data that will become available from SARS-CoV-2 infected individuals as well as those who received the spike protein-based vaccines, further investigations of the effects of the SARS-CoV-2 spike protein in human cells and appropriate animal models are warranted.") 13 Suzuki YJ, Gychka SG. SARS-CoV-2 Spike Protein Elicits Cell Signaling in Human Host Cells: Implications for Possible Consequences of COVID-19 Vaccines. Vaccines (Basel). 2021;9(1):36. Published 2021 Jan 11. doi:10.3390/vaccines9010036.

[19] Id.

[20] Id.

[21] Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine-United States, December 14-23, 2020. MMWR Morb Mortal Wkly Rep 2021; 70:46-51. DOI: http://dx.doi.org/10.15585/mmwr.mm7002e1.

[22] Safety monitoring of the J&J/Janssen vaccine suggests a risk of an adverse event called thrombosis with thrombocytopenia syndrome (TTS), which involves blood clots with low platelets. Platelets are a type of blood cell that help blood clot. On April 13, the U.S. Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC) suggested pausing administration of the AD26.COV2.S Johnson & Johnson (JJ) vaccine to allow investigation of several cases of a severe thrombosis with thrombocytopenia occurring postvaccination. This announcement came on the heels of the initial reports of similar events in individuals receiving the CHaDOx1 nCov-19 AstraZeneca (AZ) vaccine outside the United States. Clinical and laboratory characteristics of TTS have recently been reported. This syndrome has been termed "vaccine-induced prothrombotic immune thrombocytopenia (VIPIT)" or "vaccineinduced immune thrombotic thrombocytopenia (VITT)" but is now termed "thrombosis with thrombocytopenia syndrome (TTS)" by the CDC and FDA. James B. Bussel, MD et al., American Society of Hematology, Thrombosis with Thrombocytopenia Syndrome (also termed Vaccineinduced Thrombotic Thrombocytopenia), April 29, 2021

to keep your job, continue to feed your family, and avoid bankruptcy, you must be injected with the experimental COVID-19 vaccine.

### THE DEFENDANT HOSPITAL THE VACCINE MANDATES

142.     It is undisputed that the vaccine being forced upon Plaintiffs is not approved or properly approved and may be dangerous to their health.

143.     Here, Plaintiffs are in imminent and immediate danger of being terminated from their jobs for refusing to take an experimental vaccine that is being provided under an EAU.

144.     The novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, is a contagious virus spread mainly through person-to-person contact, including through the air.

145.     It is well-settled that the coronavirus presents a significant risk primarily to individuals aged 70 or older and those with comorbidities such as obesity and diabetes.[23]

**146.**     In fact, the CDC estimated that the survival rate for COVID-19 patients under 70 years of age was 99.95%.[24] In particular, the survival rate for young adults between 20 and 49 is 99.95% and for people ages 50-64 is 99.4%.[25]

147.     To date, FDA has approved three vaccines pursuant to the federal EUA statute, 21 U.S.C. § 360bbb-3. (i)  the Pfizer Vaccine on December 11, 2020; (ii) Just one week later, the Moderna Vaccine; and (iii) the Janssen Vaccine, on February 27, 2021.

---

[23] Bhattacharya and Kulldorff *See* Smiriti Mallapaty, The Coronavirus Is Most Deadly If You Are Older and Male, NATURE (Aug. 28, 2020) (individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car).

[24] COVID-19 Pandemic Planning Scenarios | CDC (last consulted August 13, 2021).

[25] *Id.*

148.    The vaccines' EUA status means that FDA has not yet approved the vaccines, but FDA permits their conditional use nevertheless due to exigent circumstances. *See* 21 U.S.C. § 360bbb-3.

149.    The standard for EUA approval is lower than that required for full FDA approval.

150.    Typically, vaccine development includes six stages: (1) exploratory; (2) preclinical (animal testing); (3) clinical (human trials); (4) regulatory review and approval; (5) manufacturing; and (6) quality control.[26]

151.    The third phase typically takes place over years, because it can take that long for a new vaccine's side effects to manifest.[27]

152.    The third phase must be followed by a period of regulatory review and approval, during which data and outcomes are peer-reviewed and evaluated by FDA.[28]

153.    Finally, to achieve full approval, the manufacturer must demonstrate that it can produce the vaccine under conditions that assure adequate quality control.

154.    FDA must then determine, based on "substantial evidence," that the medical product is effective and that the benefits outweigh its risks when used according to the product's approved labeling.[29]

155.    In contrast to this rigorous, six-step approval process that includes long-term data review, FDA grants EUAs in emergencies to "facilitate the availability and use of medical

---

[26] *See* Vaccine Testing and the Approval Process, CDC (May 1, 2014), available at https://bit.ly/3rGkG2s (last visited August 13, 2021).

[27] *Id.*

[28] *Id.*

1.    [29] *See* Understanding the Regulatory Terminology of Potential Preventions and Treatments for COVID-19, CDC (Oct. 22, 2020), available at bit.ly/3x4vN6s (last visited August 13, 2021).

countermeasures, including vaccines, during public health emergencies, such as the current COVID-19 pandemic."[30]

156.    EUAs allow FDA to make a product available to the public based on the best available data, without waiting for all the evidence needed for FDA approval or clearance. [31]

157.    The EUA statute states that individuals to whom the product is administered must be informed: (1) that the Secretary has authorized emergency use of the product; (2) of the significant known and potential benefits and risks of such use, and the extent to which such benefits and risks are unknown; and (3) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii).

## PRIOR INFECTION LEADS TO NATURALLY ACQUIRED IMMUNITY TO COVID-19 AT LEAST AS ROBUST AS VACCINE-ACQUIRED IMMUNITY

158.    Naturally acquired immunity developed after recovery from COVID-19 provides broad protection against severe disease from subsequent SARS-CoV-2 infection.[32].

159.    Studies have demonstrated prolonged immunity with respect to memory T- and Bcells, bone marrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B-cells following a COVID-19 infection.[33]

---

[30] Emergency Use Authorization for Vaccines Explained, FDA (Nov. 20, 2020), available at bit.ly/3x8wlmn (last visited August 13, 2021).
[31] See id.

[32] Lasting immunity found after recovery from COVID-19 | National Institutes of Health (NIH) (last visited August 16, 2021)
[33] Dr. Harvey Risch, Yale School of Medicine, interview ("Risch interview"), Laura Ingraham Discusses How Medical Experts Are Increasing Vaccine Hesitancy (July 26, 2021), available at https://bit.ly/3zOL6Sx (last visited August 13, 2021).

160.    T-cells last "quite a while," but B-cells migrate to the bone marrow and last even longer.[34]

161.    Recent Israeli data found that those who had received the Pfizer Vaccine were 6.72 times more likely to suffer a subsequent infection than those with naturally acquired immunity.[35]

162.    Israeli data also indicates that the protection Pfizer grants against infection is short lived compared to natural immunity and degrades significantly faster. In fact, as of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April.[36]

163.    Those who received a second dose of the Pfizer Vaccine between January and April of this year were determined to have 39% protection against infection and 41% protection against symptomatic infection. This further suggests that the large number of breakthrough infections was the result of waning vaccine protection as opposed to the spread of the Delta variant.[37]

---

[34] Risch interview.

[35] David Rosenberg, Natural Infection vs Vaccination: Which Gives More Protection? ISRAELNATIONALNEWS.COM (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 13, 2021).

[36] See Nathan Jeffay, Israeli, UK data offer mixed signals on vaccine's potency against delta strain, THE TIMES OF ISRAEL (July 22, 2021), available at bit.ly/3xg3uCg (last visited Aug. 13, 2021).

[37] See Carl Zimmer, Israeli Data Suggests Possible Waning Infection in Effectiveness of Pfizer Vaccine, THE NEW YORK TIMES (July 23, 2021); Kristen Monaco, Pfizer Vax Efficacy Dips at 6 Months, MEDPAGE TODAY (August 13, 2021), available at https://bit.ly/2VheBxw (last visited Aug. 13, 2021).

164.	Early data also suggests that naturally acquired immunity may provide greater protection against both the Delta and Gamma variants than vaccine-induced immunity. A recent analysis of an outbreak among a small group of mine workers in French Guiana found that 60% of fully vaccinated miners suffered breakthrough infections compared to zero among those with natural immunity.[38]

165.	In this vein, a few weeks ago, the CDC reported that "new scientific data" indicated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[39]

166.	Around three-quarters of cases in a Cape Cod outbreak occurred in vaccinated individuals, again demonstrating that the vaccines are inferior to natural immunity when it comes to preventing infection. [40]

167.	Many experts believe that the solution to "breakthrough" cases (individuals who become infected after vaccination or reinfection) is treating patients with a therapeutic intervention—not mandating vaccines for everyone, which will not entirely solve the problem for the reasons discussed above. The availability and effectiveness of therapeutics thus bear on the validity of state actors' claims that a vaccine mandate is necessary to protect the public health.[41].

---

[38] Nicolas Vignier, et al., Breakthrough Infections of SARS-CoV-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guiana, 2021, 27(10) EMERG. INFECT. DIS. (Oct. 2021), available at bit.ly/2Vmjx43 (last visited Aug. 13, 2021).

[39] See CDC reversal on indoor masking prompts experts to ask, "Where's the data?", WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmlQ (last visited August 13, 2021).

[40] See Molly Walker, CDC Alarmed: 74% of Cases in Cape Cod Cluster Were Among the Vaxxed, MEDPAGE TODAY (July 30, 2021), available at bit.ly/2V6X3UP (last visited August 13, 2021).

[41] See Risch interview.

## COVID-19 VACCINES CAN CAUSE SIDE EFFECTS, INCLUDING SEVERE ADVERSE EFFECTS

168.     Though the COVID-19 vaccines appear to be relatively safe at a population level, like all medical interventions, they carry a risk of side effects. Those include common, temporary reactions such as pain and swelling at the vaccination site, fatigue, headache, muscle pain, fever, and nausea. More rarely, they can cause serious side effects that result in hospitalization or death. [42]

169.     The vaccines could cause other side effects that remain unknown at this time given the preliminary, emergency stage of the vaccines' approval process. Put differently, as a matter of simple logic, one cannot be certain about the long-term effects of a vaccine that has existed only for approximately a year, and thus cannot have been studied over a substantial period of time.

170.     A recent study suggests that the SARS-CoV-2 spike protein can by itself trigger cell signaling that can lead to various biological processes.[43] The scientists who conducted the study concluded, "It is reasonable to assume that such events, in some cases, result in the pathogenesis of certain diseases."[44] Despite the experimental nature of the vaccine and the numerous adverse side effects related to the experimental vaccine including, but not limited to, death through anaphylactic shock[45], thrombosis with thrombocytopenia

---

[42] Possible Side Effects After Getting a COVID-19 Vaccine | CDC ; Reactions and Adverse Events of the Pfizer-BioNTech COVID-19 Vaccine | CDC (last visited August 16, 2021).
[43] Suzuki YJ, Gychka SG. SARS-CoV-2 Spike Protein Elicits Cell Signaling in Human Host Cells: Implications for Possible Consequences of COVID-19 Vaccines. Vaccines (Basel). 2021;9(1):36. Published 2021 Jan 11. doi:10.3390/vaccines9010036
[44] Id.
[45] Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine-United States, December 14-23, 2020. MMWR Morb Mortal Wkly Rep 2021; 70:46-51. DOI: http://dx.doi.org/10.15585/mmwr.mm7002e1.

syndrome[46], blood clots, multi-system autoimmune disorders and multi-organ failure, and

the fact that some scientists have concluded that it is reasonable to assume the experimental

vaccine will result in the pathogenesis of certain diseases, [EMPLOYER] gave employees

an ultimatum - if you want to keep your job, continue to feed your family, and avoid

bankruptcy, you must be injected with the experimental COVID-19 vaccine.

## HERD IMMUNITY IN THE TRI-STATE AREA

171.     Herd immunity occurs when a large portion of a community (the herd) becomes

immune to a disease, making the spread of disease from person to person unlikely. As a

result, the whole community becomes protected — not just those who are immune.[47]

172.     Often, a percentage of the population must be capable of getting a disease in order

for it to spread. This is called a threshold proportion. If the proportion of the population

that is immune to the disease is greater than this threshold, the spread of the disease will

decline. This is known as the herd immunity threshold.

173.     The percentage of a community that needs to be immune to achieve herd immunity

varies from disease to disease. The more contagious a disease is, the greater the proportion

of the population that needs to be immune to the disease to stop its spread. *Id.*

---

[46] Safety monitoring of the J&J/Janssen vaccine suggests a risk of an adverse event called thrombosis with thrombocytopenia syndrome (TTS), which involves blood clots with low platelets. Platelets are a type of blood cell that help blood clot. On April 13, the U.S. Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC) suggested pausing administration of the AD26.COV2.S Johnson & Johnson (JJ) vaccine to allow investigation of several cases of a severe thrombosis with thrombocytopenia occurring postvaccination. This announcement came on the heels of the initial reports of similar events in individuals receiving the CHaDOx1 nCov-19 AstraZeneca (AZ) vaccine outside the United States. Clinical and laboratory characteristics of TTS have recently been reported. This syndrome has been termed "vaccine-induced prothrombotic immune thrombocytopenia (VIPIT)" or "vaccineinduced immune thrombotic thrombocytopenia (VITT)" but is now termed "thrombosis with thrombocytopenia syndrome (TTS)" by the CDC and FDA. James B. Bussel, MD et al., American Society of Hematology, Thrombosis with Thrombocytopenia Syndrome (also termed Vaccineinduced Thrombotic Thrombocytopenia), April 29, 2021.
[47] Herd immunity and COVID-19 (coronavirus): What you need to know - Mayo Clinic (last consulted August 12, 2021)

174.     There are two main paths to herd immunity for COVID-19 — infection and vaccines. Herd immunity can be reached when enough people in the population have recovered from a disease and have developed protective antibodies against future infection. *Id.*

175.     Herd immunity also can be reached when enough people have been vaccinated against a disease and have developed protective antibodies against future infection. *Id.*

176.     Herd immunity makes it possible to protect the population from a disease, including those who can't be vaccinated, such as newborns or those who have compromised immune systems.

177.     According to a report from Harvard doctors, herd immunity is reached when at least 70% of the population either being vaccinated or exposed to the virus. Alvin Powell, Vaccines can get us to herd immunity, despite the variants, HARVARD GAZETTE (Feb. 25, 2021), https://news.harvard.edu/gazette/story/2021/02/vaccinesshould-end-the-pandemic-despite-the-variants-say-experts/#:~:text=A%20Harvard%20immunologist%20said current,fight%20agaisnt%20the%20disease.

178.     All states are currently making progress toward herd immunity through a combined approach. The number of fully vaccinated adults continues to rise. In addition, people in each state have had confirmed infections with the COVID-19 virus.

179.     Research shows that those who have recovered from Covid-19 develop lasting immunity, up to 6 to 8 months after infection. Lasting immunity found after recovery from COVID-19 | National Institutes of Health (NIH) (last visited August 13, 2021).

**THE SAFETY PROTOCOLS IN PLACE AT EVERY DEFENDANT HOSPITAL AND THE NUMBER OF VACCINATED EMPLOYEES COMBINED WITH THOSE**

## WHO HAVE RECOVERED FROM COVID-19 ARE SUFFICIENT TO PREVENT THE SPREAD OF THE COVID-19 VIRUS

180.    On or around April 2020, the CDC recommended the wearing of non-medical masks in public to lessen in public to lessen transmission of Covid -19 in the United States. Scientific evidence for the protective effect of face masks and respiratory virus infection in healthcare and community settings is overwhelming.[48]

181.    The wearing of masks, along with the other safety protocols recommended by the CDC such as the social distancing and frequent hand washing contributed to the significant reduction of the spread of Covid-19 disease before vaccines were made available.

182.    After vaccines became widely available, on May 13, 2021, the CDC rescinded its guidance on mask requirements and social distancing. [49]

183.    On June 28, 2021, the rapid spread of 43the Delta variant, a new variant of the Covid-19 virus, prompted the CDC to update once again its masks guidance and to urge even vaccinated people to wear masks again in indoor settings. [50]

184.    Further, despite the current availability of vaccines, breakthrough infections are on the rise. [51] New evidence suggests that vaccinated people with breakthrough infections can carry as much as the virus as unvaccinated people. [52]

185.    Current research shows that vaccinated people with a breakthrough infection will have milder symptoms and will rarely die. [53]

---

[48] open (ncdhhs.gov) (last visited August 13, 2021).
[49] CDC ends indoor mask requirements for fully vaccinated people | AHA News (last visited August 13, 2021).
[50] Your Guide to Masks | CDC (last visited August 13, 2021).
[51] Breakthrough Infections and the Delta Variant: What to Know - The New York Times (nytimes.com)(last visited August 13, 2021)
[52] Id.
[53] Id.

**186.** Defendant follows all of the CDC guidelines. It requires all of its employee and visitors, regardless of their vaccination status, to wear masks at all times. In addition, staff wears medically appropriate masks.

**EMPLOYER' S VACCINATION MANDATE POLICY AND CONSEQUENCES**

187. On July 29, 2021, Joe R. Biden, president of the United States announced that all federal employees and contractors are now required to be fully vaccinated against COVID-19 or face regular testing before returning to in-person work, and he also encouraged states and localities to pay $100 to each newly vaccinated American.[54]

188. Defendants in total disregard for the individual rights and possible well-being of its employees, Defendants announced the Policy on August 5, 2021.

189. Plaintiffs are not given any other choice other than to accept the vaccination forced upon them by Defendants and complete it first by a shot by September 1 and then complete by October 1.

190. As a result of the Policy, Plaintiffs are being pressured to take a vaccine that has not yet been finally approved and that they do not wish to take or lose their employment.

191. If they choose not to take the vaccine and as a result lose their employment, the likelihood is great that they will not be able to find other employment because of Defendants' concerted action.

192. By threatening adverse professional and personal consequences, each of the Policies not only directly and palpably harms Plaintiffs' autonomy and dignity, but it forces them to endure the stress and anxiety of choosing between their career and their health.

---

[54] FACT SHEET: President Biden to Announce New Actions to Get More Americans Vaccinated and Slow the Spread of the Delta Variant | The White House (last visited August 13, 2021)

193.    The risk-avoidance benefits that each of the Policies purports to provide, compared to the restrictions and intrusive options offered to Plaintiffs are disproportionate. Similarly, given that the current health safeguards in place at Defendant and in particular the fact that all employees and visitors confer ample protection against transmission of the virus, each of the Policy is arbitrary and irrational.

194.    Finally, there is no indication that the Policy is tailored to account for its impact in an environment where employees comply with these guidelines and/or those who have acquired natural immunity.

195.    Thus, based on the level of vaccination attained in the population served by Defendants and within the employees of Defendants and the number of people who have recovered from Covid-19 and are therefore protected in the population served by Defendants and within the employees of Defendants, there is no legitimate public health rationale for Defendants to mandate that all of their employees be vaccinated or face termination.

## REASONS PLAINTIFFS AND MEMBERS OF THE CLASS DON'T WANT TO TAKE THE VACCINE

196.    Based on existing estimates of people who have taken the vaccine AND those who had Covid - herd immunity has been achieved.

197.    The purpose of a vaccine is to make your body generate antibodies - those who had Covid have their own naturally generated and apparently robust antibodies.

198.    As opposed to the regular flu vaccine (which has decades of safety data and yet sometimes still "misses"), the Covid vaccine has no long-term data AND the rate at which the vaccine makes antibodies develop in those who take the vaccine is UNKNOWN.

44

199.    The current vaccine was developed for the original Covid-19 virus and not Delta (or other variants) THUS "breakthrough" cases RE: Lindsay Graham.

200.    FTC argument = According to Federal Trade Commission (FTC) Guidelines and the FTC's "Truth In Advertising,", promotional material—and especially material involving health-related products—cannot mislead consumers, omit important information, or express claims. All of this falls under the rubric of "deceptive advertising."

201.    Nuremberg code argument = EUA products are unapproved, unlicensed, and experimental. Under the Nuremberg Code—the foundation of ethical medicine—no one may be coerced to participate in a medical experiment. The individual's consent is absolutely essential. No court has ever upheld a mandate for an EUA vaccine. In Doe #1 v. Rumsfeld, 297 F. Supp. 2d 119 (2003)15, a federal court held that the U.S. military could not mandate EUA vaccines for soldiers

202.    Institutional liability argument- whereas pharmaceutical companies that manufacture EUA vaccines have been protected from liability related to injuries or deaths caused by experimental agents since the PREP Act1 was enacted in 2005, companies and all other institutions or individuals who mandate experimental vaccines on any human being are not protected from liability. Are you aware that you do not enjoy such liability.

203.    Let's compare and contrast all vaccine reported adverse events in US since 1/1/2006 (15 years) verses COVID19 vaccines

Deaths:

All vaccines 3,515

COVID19 12,366 (underreported by factor of at least 4x)

All reported adverse events:

45

All vaccines: 505,109 (since 1/1/2006)

COVID19: 545,338

Total permanent disabled from COVID19 injections: 14,251

204.    Therefore, between the deaths and disability we have 26,617 Americans either

dead or disabled at a MINIMUM by the vaccine. This is neither safe nor effective.

205.    Created at "warp speed" in 9 months

206.    No long-term safety testing

207.    Emergency Use Authorization, not FDA approved (the alleged FDA approval today

still is not an approval under proper rules)

208.    Lack of trust in inconsistent government medical advice

209.    Not necessary for a virus with a 99.98% survival rate

210.    Concerns how it could affect fertility and children

211.    Concerns how it could affect pregnancy.

212.    Adverse reactions and deaths are mostly unadvertised and under-reported

213.    Personal family history of blood clots, drug reactions and strokes

214.    Natural immunity after Covid-19 infection

215.    Hidden list of unfamiliar ingredients

216.    **Lack of informed consent is unethical. It makes no sense to claim to inform a**

**healthcare worker of the "risks" and then not allow the healthcare worker to refuse**

**the vaccine.**

217.    Safe and effective treatments and preventatives are available

218.    Vaccine makers cannot be sued for injury or death

219.    Moderna and Johnson & Johnson don't have history of making vaccines

220.     Pfizer, Moderna, and Johnson & Johnson all have controversial and checkered past

221.     These shots don't fit the traditional definition of a vaccine

222.     Too many conflicts of interests among vaccine experts and CEOs

223.     Marketing campaign with celebrities and incentives is too intense

224.     Media censorship of opposing medical experts is unprecedented

225.     Unjust suppression of social media reports from vaccine victims and their families

226.     "My body, my choice"

227.     The ugly history of attempts to make vaccines for the coronavirus (cold family)

228.     No access to the raw data from the vaccine trials

229.     People are catching covid after getting the vaccine

230.     The numbers for covid cases and deaths were inflated and fudged from the start by

faulty testing and reporting.

**TEN LIES BEING TOLD TO THE AMERICAN PUBLIC ABOUT COVID**

231.     Lie #1: Covid is still contagious when you're asymptomatic.

232.     Lie #2: PCR tests tell you whether or not you have or had Covid-19 (or Delta).

233.     Lie #3: Vaccines usually prevent you from catching Covid, or make it a mild case

if you do.

234.     Lie #4: Covid-19 vaccines help with immunity against variants, like Delta and

Lambda.

235.     Lie #5: A lab can test for Covid-19 and prove in court if you had it (like forensic

DNA).

236.     Lie #6: Covid vaccines are safe, even for pregnant women.

237.     Lie #7: Vaccine immunity is stronger than natural immunity.

238.    Lie #8: Without vaccines, you're at high risk of catching and dying from Covid.

239.    Lie #9: Vaccines provide better immunity for Covid than vitamin D, zinc and ivermectin.

240.    Lie #10: Masks, social distancing and lockdowns have helped "flatten the curve."

**ACCORDING TO DR. PETER A. MCCOLLOUGH**

241.    Dr. McCollough is a leading doctor against the vaccine. What follows are his publicly stated opinions.

242.    The Covid 19 virus is not spread by asymptomatic people.

243.    No one that is tested should be asymptomatic. The FDA never approved these tests for asymptomatic people. And on June 25, 2021 the World Health Organization said no tests should be done on asymptomatic people.

244.    Natural Immunity is robust, complete and durable. There is no meaningful chance of having a second significant illness of Covid if you already had it. That person's immunity can't be improved by the vaccine.

245.    Covid 19 is easily treated at home. 85% of hospitalizations are avoidable if treated early.

246.    CDC controls VAERS (Vaccine Adverse Event Reporting System). There are a recorded 9,000 deaths from the vaccine. There is a lawsuit (Tom Rentz) that says over 45,000 deaths. Medicare and Medicaid have also covered up these deaths.

247.    Current Covid 19 vaccines are obsolete. They do not cover the new variants. These vaccines have caused record mortalities and injuries and should be considered unsafe.

**REPORT FDA APPROVES PFIZER COVID VACCINE AUGUST 23, 2021**

48

248.    If this happens, it changes nothing.  In fact, it is a sick political ploy to try and further coerce leery healthcare workers and Americans to obtain the vaccine.  It also comes when the Biden Administration wants a "booster" shot.

249.    The vaccine still has not gone through normal FDA testing.

### PFIZER

250.    A leaked document reveals the shocking terms of Pfizer's international COVID-19 vaccine agreements.

251.    Countries that purchase Pfizer's COVID-19 shot must acknowledge that "Pfizer's efforts to develop and manufacture the Product" are "subject to significant risks and uncertainties."

252.    In the event that a drug or other treatment comes out that can prevent, treat or cure COVID-19, the agreement stands, and the country must follow through with their vaccine order.

253.    While COVID-19 vaccines are "free" to receive in the U.S., they're being paid for by taxpayer dollars at a rate of $19.50 per dose; Albania, the leaked contract revealed, paid $12 per dose.

254.    The purchaser of Pfizer's COVID-19 vaccine must also acknowledge two facts that have largely been brushed under the rug: both their efficacy and risks are unknown.

255.    Purchasers must also "indemnify, defend and hold harmless Pfizer ... from and against any and all suits, claims, actions, demands, losses, damages, liabilities, settlements, penalties, fines, costs and expenses ... arising out of, relating to, or resulting from the Vaccine."

256.      Vaccine makers have nothing to lose by marketing their experimental COVID-19

shots, even if they cause serious injury and death, as they enjoy full indemnity against

injuries occurring from COVID-19 vaccines or any other pandemic vaccine under the

Public Readiness and Emergency Preparedness (PREP) Act, passed in the U.S. in 2005.

**257.      Pfizer, CDC and others are not mandating it's own employees to become**

**vaccinated.**

258.      Karen Kingston, a former Pfizer employee, has come forward with the assertion

all Covid-19 vaccines are bioweapons.

259.      There are 4 PEGylated lipid nano particles in the COVID-19 vaccines (PEG =

polyethylene glycol):

   A.  a cholesterol lipid enables the vaccine ingredients to be transported by the blood

   B.  the phospholipid adheres to the cell membrane to make it permeable

   C.  an ionizable lipid provides a positive ionic charge so the mRNA can enter the cell

   D.  a PEGylated lipid made by SINOPEG, a Chinese company

260.      mRNA is very unstable, thus it needs a "biosphere" to protect it until it can enter

the cell – this is provided by the lipid nano particles and graphene oxide which is 4,000

time stronger than titanium, can withstand 1,700 F temperatures, is an excellent

conductor of electricity, and can host a magnetic field.

261.      Graphene oxide is not listed in the patent applications because a), it is poisonous

to humans and b), because it is the main ingredient in hydrogel which can be used to

create a brain-computer interface and a drug delivery system, though Kingston notes that

this is not possible "with this round [of vaccines]" because "they rushed this thing out"

and "they're just seeing how much they can put into people before they… die."

262.     The graphene oxide in the vaccines is neutrally charged (inactive), however if/when it becomes positively charged, such as by electromagnetic radiation (radio frequency, such as wireless devices, wireless networks such as 5G, etc.), it will annihilate anything it comes into contact with and therefore can cause great damage and death depending on how much of it exists in the body and where it is located

263.     Multiple COVID-19 "vaccines" and booster shots may increase the amount of graphene oxide in the body.

264.     The COVID-19 vaccine study should have been stopped when, during a study with mice, 80% died within 24 hours and the remainder died within the next few days.

265.     Pfizer and Children's have a study to develop the vaccine in an ongoing clinical trials, and will benefit financially if more people are required to take the shots which, until fully licensed by the U.S. Food and Drug Administration (FDA), are defined by the FDA as experimental.

**GENERAL FACTUAL ALLEGATIONS RELATIVE TO DEFENDANTS**

266.     **The entire Covid 19 "pandemic" has been one based upon lies, misrepresentations and fear to advance the purpose of those engaged in those lies, misrepresentations and fear mongering: the U.S. government, state governments, the media, pharmaceutical companies, corporate America and hospitals.**

267.     **The history of government, media, pharma, corporate America and hospitals lying to the public is well documented.**

268.     **Yet, the government, pharma, the media and the healthcare industry want everyone to TRUST them on the vaccine issue.**

269.     **It is all a diabolical fraud upon the public.**

270. Children's Hospital Medical Center (CCHMC) will place employees on two-week suspension on October 1, 2021, if not fully vaccinated for COVID-19.

271. The two-week suspension will give employees "time to think and comply."

272. CCHMC will terminate employment on October 31, 2021, if employee is not fully vaccinated.

273. CCHMC CEO, Michael Fisher, lacks integrity.

274. CCHMC providing unethical and immoral actions.

275. CCHMC is violating medical autonomy.

276. CCHMC is falsifying Informed Consent.

277. CCHMC leadership causing peer pressure on associates.

278. CCHMC guilting associates.

279. is knowingly holding career and salary as leverage to vaccinate.

280. CCHMC is coercing all associates.

281. CCHMC is knowingly creating animosity between the vaccinated and unvaccinated associates.

282. CCHMC is knowingly creating mental health distress in associates regarding COVID–19.

283. CCHMC COVID–19 mandate is creating associates home issues with spouse/significant other.

284. CCHMC advised associates not post on social media accounts regarding vaccines/protests.

285. CCHMC is forcing their associates to do an action that associate does not believe in.

286.    CCHMC knowingly is putting patients' lives at risk by the vaccine mandate.

287.    CCHMC is ridiculing associates by blaming them for "spreading Covid."

288.    CCHMC has created a hostile work environment.

289.    CCHMC giving employees very short and unfair timeline.

290.    CCHMC is refusing employees alternative options to COVID-19 vaccine.

291.    Religious and Medical exemptions being denied.

292.    CCHMC requiring employees to report for shift even after exposure to COVID-
19 person.

293.    CCHMC is requiring employees to use their PTO if side effects from COVID-19
vaccine.

294.    CCHMC refusing to allow employees to use accrued PTO time during COVID-19
"suspension."

295.    CCHMC utilizes a self-screening COVID process for employees.

296.    CCHMC requiring religious or medical exemption to "prove nursing judgement
or abilities."

297.    CCHMC HR department will decide who gets exemption approval.

298.    CCHMC requires supporting documentation for religious exemption.

299.    Dedication is no longer valued at CCHMC.

300.    CCHMC not reporting all adverse side effects.

301.    CCHMC pressuring employees to receive COVID-19 vaccine.

302.    CCHMC criticizing unvaccinated employees stating they are "harmful."

303.    CCHMC, Cleft & Craniofacial Clinic physicians, tell other employees "the
unvaccinated should be fired immediately."

53

304.    CCHMC, Cleft & Craniofacial physicians, tell other employees the unvaccinated "they should be ashamed of themselves."

305.    CCHMC offers cash incentives to get the COVID-19 vaccine.

306.    CCHMC is shaming employees for not receiving COVID-19 vaccine to date.

307.    CCHMC rehiring employees but requires vaccination decision before proceeding with orientation.

308.    CCHMC is not providing internal website with an exemption option nor questions/concerns tab.

309.    CCHMC is making mandate an ultimatum.

310.    COVID-19 vaccine administration form requires signature stating, "I volunteered to take this vaccine."

311.    CCHMC has no regard to personal belief, natural immunity or informed consent.

312.    CCHMC administration/management are bullying and harassing unvaccinated employees.

313.    CCHMC is blatantly lying and passing false information to employees.

314.    CCHMC employees are seeing employer retaliation.

315.    CCHMC refuse to allow titer draws prior to COVID-19 vaccine.

316.    CCHMC has threatened employees that if caught protesting for Medical Freedom, they will be terminated.

317.    CCHMC is manipulating employees.

318.    CCHMC is currently short staffed prior to COVID-19 vaccine mandate.

319.    Physicians refusing to sign medical exemptions stating, "our hands are tied."

320.    CCHMC advising employees they are not receiving exemptions at this time.

321.    CCHMC instructing physicians and nurse to push COVID-19 vaccine.

322.    CCHMC refused to give employees annual raise in 2020 due to COVID-19 pandemic and expenses from it.

323.    Personal and philosophical reasons for not receiving COVID – 19 vaccines will not be granted.

324.    Deadline for associate's completion of COVID – 19 vaccine is October 1, 2021.

325.    CCHMC mission is "to purse optimal health for every child within our reach."

326.    CCHMC CEO, Michael Fisher, has an income of 1.7 million annually.

327.    CCHMC is knowingly mandating the booster vaccine once the requirements are presented.

328.    CCHMC knowingly has an interview process to question employees with exemptions.

329.    CCHMC knowingly is mandating personal religious information from associates.

330.    CCHMC knowingly was awarded government funding from if facilities "mandated" vaccine.

331.    CCHMC knowingly forces physicians to violate the Hippocratic Oath or be reprimanded.

332.    CCHMC knowingly forces nurses to violate the Nightingale Oath or be reprimanded.

333.    CCHMC is knowingly disregarding the Nuremberg Code.

334.    CCHMC knowingly is denying medical letters from physicians regarding employees with medical conditions re: COVID-19 exposure.

335.    CCHMC knowingly has to mandate the Influenza (Flu) vaccine, with 80% vaccination rate, in order to keep Medicare/Medicaid funding under the Affordable Care Act (ACA).

336.    CCHMC unable to provide specific information on COVID – 19 vaccines.

337.    CCHMC knows there is NO specific test to rule the Delta variant.

338.    CCHMC knows that the PSR testing can not specify a specific virus.

339.    CCHMC is knowingly aware that antibodies remain in person's blood for 90 days.

340.    CCHMC is knowingly aware that patients/associates tested within 90 days of positive test will result in false/positive readings.

341.    CCHMC is knowingly aware that they cannot count positive tests conducted within 90 days of positivity.

342.    CCHMC is stating the COVID-19 vaccine prevents one from COVID-19 virus.

343.    CCHMC states the COVID-19 vaccine prevents transmission of the COVID-19 virus.

344.    CCHMC knowingly acknowledges COVID-19 can be contracted in fully vaccinated.

345.    CCHMC knowingly is falsifying the correct number of COVID-19 cases.

346.    CCHMC knowingly is falsifying reports to VAERS on adverse side effects.

347.    CCHMC knowingly is not reporting all adverse side effects to VAERS.

348.    CCHMC knowingly is having associates report to work during exposure to positive COVID-19 family members in same home.

349.    CCHMC knowingly is violating First Amendment Rights.

350.     CCHMC knowingly is violating human, civil and legal rights.

351.     CCHMC is knowingly violating HIPAA Policy.

352.     CCHMC is knowingly committing Adult and Child Abuse.

353.     CCHMC is forcing tyranny.

354.     CCHMC Knowingly allowing management to call employees; stupid, dumb, incompetent, and uneducated.

355.     CCHMC knowingly knows of an Ethics complaint filed on August 12, 2021 for workplace harassment.

356.     CCHMC, Dr. Saal, is knowingly bullying employees stating, "you should be fired for not vaccinating."

357.     CCHMC knowingly has management texting employees recommending they find outside jobs outside of hospital.

358.     CCHMC knowingly "suspended" an employee for posting on personal social media, opinions on hospital mandate. Advised her to not return until she sought medical attention from a physician stating she was "mentally fit to return".

359.     CCHMC knowingly denied a Christian employee a religious exemption and stated "It would have been approved if you were Indian."

360.     CCHMC knowingly changed termination wording to separation.

361.     CCHMC is knowingly denying exemptions due to "the medical board and I recommend the vaccine".

362.     CCHMC CEO, Michael Fisher, is bypassing Directors in the exemption process.

363.     CCHMC knowingly knows that PET scans regarding cancer patients will have a false/positive result. Due to the vaccine.

364.    CCHMC is knowingly offering traveling nurses, who are vaccinated, to take NICU positions for $2800/week.

365.    CCHMC knowingly will not allow employees to work nor offer an additional incentive. Claims "better financially."

366.    CCHMC knowingly is aware that the VAERS website is reporting 6,000 deaths from the vaccine. Which is a lie, all cases are not being reported.

367.    CCHMC knowingly is aware that the VAERS website is reporting 35,000 from adverse side effects. Which is a lie, all cases are not being reported.

368.    CCHMC knowingly laid off employees from April 2020 – September 2020 due to lack of admissions.

369.    CCHMC CEO, Michael Fisher, knowingly told employees they are not to take to any media outlets.

370.    CCHMC CEO, Michael Fisher, knowing admitted that persons can still be infected with COVID-19 after vaccination.

371.    CCHMC CEO, Michael Fisher, claims that natural infection is not more protective than the COVID-19 vaccine.

372.    CCHMC CEO, Michael Fisher, knowingly claims the COVID-19 vaccines are proven to be highly protective, even against other variants.

373.    CCHMC CEO, Michael Fisher, knowingly states that" it is impossible to contract COVID-19 from the vaccine."

374.    CCHMC CEO, Michael Fisher, knowingly states "testing forms we use can detect the variants".

375. CCHMC CEO, Michael Fisher, knowingly stated "the trails so far have not tested the vaccine in immunocompromised people."

376. CCHMC CEO, Michael Fisher, knowingly terminated two employees just for talking to media. On their personal time.

377. On August 5, 2021, Cincinnati Children's Hospital Medical Center (CCHMC) sent out an email to all employees, vendors, contractors and volunteers that they must be fully vaccinated by October 1, 2021.

378. Exemption forms were not sent out until August 13, 2021.

379. Psychological Exemptions are not being offered as have been in the past.

380. Mandate states that if the vaccine causes side effects, employees must use their PTO time to be off.

381. By submitting a medical exemption, you are required to give CCHMC full access to your medical records.

382. Managers at CCHMC are encouraging their staff who refuse to get the vaccine to find a job outside the hospital.

383. In the hospital chat "YAMMER", CCHMC doctors were telling everyone that no one has died from the covid vaccine.

384. Employee states that HIPAA and other privacy acts are not being followed by staff as they are asking people if they are vaccinated and their reasoning for not doing so.

385. Employee was told that her religious exemption was denied and that if she was "Indian", they would have approved it.

386.   Employee states that they were performing their own temperature checks at the beginning of their shift. They were to record it in a notebook and someone would come at the end of the shift and sign off on it.

387.   Employee has asked for the ingredients of the vaccine several times and each time has been told they don't have them.

388.   Employee states that they are still looking for COVID vaccination participants in a study, yet they are mandating something they are still researching.

389.   Employee states that numerous children who have received the vaccination have come back to their emergency rooms with cardiac arrest, myocarditis, endocarditis and many other issues.

390.   Employees who have tested positive for antibodies are still being mandated to take the vaccine.

391.   Employee states she asked her manager about getting a medical exemption due to nursing her child and was told to "switch her baby to formula."

392.   All the following paragraphs relative to hospitals also applies to Defendants and Plaintiffs.

393.   Facebook not only posted a referral to every vaccine post, but they would also put this up on profiles: "Add a Covid-19 vaccine frame to your profile picture. We can all play a part in ending the pandemic. Your new picture will be shown to your friends to inspire them to get their vaccines as soon as they can."

394.   **When there was no vaccine, the workers had to go to work. They were heroes. Now that there is a vaccine, they have to get the vaccine or be fired. Now they are "zeros."**

60

395. They are admitting patients that test positive with even the slightest symptoms to raise the surge.

396. Treatments like hydroxychloroquine, ivermectin and zinc work. Since the outbreak, treatment is no longer an uncertainty. There is no shortage of ventilators.

397. This is a HUGE governmental cover-up. The Covid crisis was political to help elect Joe Biden. 165 million Americans are now vaccinated. When people receive the shot, their immune system is distressed. This causes them to asymptomatically get COVID-19. That is the cause of the spread. Also, since the mRNA only makes the spike protein, it is to antibody specific vs. an attenuated virus vaccine like influenza. Viruses mutate but the shot is not killing off the variants which is causing more infectious variants such as the Delta to spread. Our government is pushing for the shot to cover-up their mistakes. If EVERYONE is vaccinated, then no one will be the wiser since we will ALL be in the same boat.

398. It is the classic: it too deep to come clean now.

399. **On August 5, 2021, all six major healthcare systems in the Cincinnati area announced their joint mandate:**

    **A. St. Elizabeth Medical Center**

    **B. Children's Hospital**

    **C. Christ Hospital**

    **D. U.C. Health**

    **E. Tri-Health**

    **F. Mercy**

**If there is any doubt of an antitrust claim, here it is.**

61

400.     Christ Hospital CEO Debbie Hayes, Cincinnati Children's CEO Michael Fisher, Trihealth CEO Dr. Richard Lofgren attended the August 5 press conference to announce a Covid-19 vaccine mandate for employees.

401.     All six major health systems in Greater Cincinnati will now require the Covid-19 vaccine for workers this fall- a major push that comes amid their false claim of growing spread of the Delta variant and a flattening in vaccination rates regionwide.

402.     Collectively, these six health systems account for nearly 63,000 employees. Nearly 40% are not vaccinated.

403.     "This is going to go a long way to putting the pandemic in the rearview mirror, if we can get everyone vaccinated," Cincinnati Children's CEO Michael Fisher said. "We invite other employers to join in this effort." It is an incredible act of tyranny.

**404.     All six healthcare systems are using October 1 as the target date and September 1 as the first "shot."**

405.     Hospital officials declined to share projected vaccination rates for their staff and physicians, saying the numbers are estimates. The process for reporting the Covid-19 vaccine status will be similar to the flu.

**406.     "It's a condition for employment." Trihealth CEO Mark Clement said. "We take an oath to do no harm. And this is one tangible way we can promote no harm for our patients." This is a lie. Thousands of healthcare workers not treating patients not only never take that oath, they do not treat patients. It's also offensive. The vaccine causes harm to workers who receive it. A vaccine is for the person taking it, not others.**

407.    The American Hospital Association, the American Medical Association, and the Ohio Hospital Association recently advised healthcare employers require workers be vaccinated against Covid-19. This is completely self-serving to lock step with the government.

408.    "Because of the highly contagious Delta variant and significant numbers of unvaccinated people- including children younger than 12 years old- Covid-19 cases, hospitalizations and deaths are again rising," Fisher said. That too is a lie. And to blame unvaccinated children is evil.

409.    Per the Health Collaborative, 59% of those eligible in the 15-county region have been vaccinated against Covid-19. This of course means 41% have not.

410.    **This email from a St. Elizabeth nurse on August 19, 2021 requires it's placement in its entirety. This email is a representation of nearly 10,000 emails in the two weeks received by Deters Law from healthcare workers.**

**"Here is what I know: As of yesterday, in all St E's 3 major hospitals (EDG/FLO/FTT) there are 118 pts "diagnosed" with Covid-19 and are in Airborne Isolation precautions. Of those 118 pts, 16 of them are in ICU beds.**

**I count the patients regularly. What I have seen continuously in all pts is as the numbers grow, it still remains 1/3 of them are vaccinated. AND (as of yesterday) out of those 118, the MICU has 5/9 pts with Covid who are vaccinated, SICU has 1/1 with Covid who are vaccinated, CICU has NO Covid positive, FTT ICU has 3/3 Covid positive who are vaccinated and FLO ICU has 1/4 Covid positive who are vaccinated. So out of ALL the Covid positives that are in all of the ICUs there are only 16 pts, 10 of which are vaccinated....that is well above a third. AND there are at least 20-30 that are Vaccinated that are in the other units that do NOT have a Covid diagnosis, but for some weird reason they all have developed Acute Respiratory Failure from Pneumonia in the middle of the summer.**

**There is also a case of one of my patients that is diagnosed with Covid that has NO test results either outside St E or inside St E documented anywhere in her chart. All the notes from doctors say she was diagnosed with Covid outside of the hospital, but all that is really in her chart is a note that the EMT stated that some RN told him**

she was diagnosed with Covid, but there is NO evidence of it and St E never tested her to be sure....they are counting her Covid positive on hearsay.

Another one of my patients tested positive it St. E, got better, went to Encompass Rehab and had to be readmitted to St E. Prior to his admission, he tested negative at Encompass, but St. E had him Covid positive again. I called Encompass, had them fax his test results, sent them to the MICU and they did not care. They left him in the system as Covid positive and NEVER was that negative test document scanned into his chart. Both of those Covid positive cases counted in St E's numbers were of pts unvaccinated."

411.　The following email is a from a Christ Hospital nurse:

A member of the infectious control committee of Christ Hospital informed several staff that only 50% of the Covid tests are accurate. He said that out of his own mouth that it's about the money. He said doctors and hospitals are pushing these tests and even skipping over proper assessments because with each positive test the facility gets around 10,000 dollars, every hospitalization they get around 15,000, and with every death it's around 30,000. That's why even though the hospitalization may have not originally been due to COVID (patient had a heart procedure, but tested positive), they will put the cause was COVID. Or cause of death was COVID. I also overheard two doctors talking in the hall when vaccines first started coming out about how they had several in-patients and people coming in through the OR with these side effects or adverse reactions to the vaccine and they didn't know how to treat it. During the pandemic starting last year Christ told the employees that even if they were exposed to COVID we still had to come in if we weren't symptomatic.

412.　It makes no sense to require remote workers to receive the vaccine.

413.　Now the VA is requiring weekly testing for Covid. The tests are PCR tests which are used for DNA testing and the creator of the test states that this test should not be used for Covid testing. They are using up to 45 x replications which creates a 97% false positive rate.

414.　A VA employee stated: "If I am tested and it comes back positive (even though I am not and have no symptoms) I would have to be off work for 2 weeks and use my vacation time."

415.     On August 3 the Ohio Hospital Association (OHA) issued a directive to all the hospitals regarding mandating the vaccines.  The CEO is Mike Abrams.

416.     On August 5 Tri-Health issued the statement to the media/public about the mandating of the vaccines.

417.     On the very same day Mike Abrams was elected to the Board of Trustees of the American Hospital Association. This organization issued a memo to suspend all memberships in which the member disagreed with the electoral college results of the Biden election. (see below link.)   https://www.aha.org/press-releases/2021-01-14-aha-statement-political-giving-practices-following-tragic-events-us

418.     Abrams' appointment on the AHA was his payback for moving all the hospitals to mandate the vaccine under his command at the OHA.  It's evil.

419.     The AHA and OHA is recommending these mandates solely out of financial bribes.

420.     Robert Wiehe, Chief Administrator Officer at UC Medical Center on August 20, 2021 sent out this message to all the UC Medical Center workers: "UC Medical Center continues to have staffing vacancies in most of our clinical areas.  Leadership reviews our staffing levels on a daily and weekly basis to assure that we are maintaining safe levels of care for our patients.  Operationally, we have closed rooms, tightened our transfer policy and constrained some admissions from our surgical and procedural areas.  We are doing this to help control staffing ratios and provide safe care for our patients and employees.  We do not take these decisions lightly and continue to work with all stakeholders to look for innovative solutions to increase our staffing levels.  As always, thank you for your

resilience and what you do every day for our patients. See below for details on many of the interventions that have already begun or are ongoing."

421.  This is indicative of all hospitals. And it's being caused not by Covid, but by the hospital mandates.

422.  Hospitals have refused to answer questions to workers regarding who would be liable if they suffer adverse consequences from the vaccine.

423.  Hospitals refer their workers to their FAQ (frequently asked questions) for answers to questions which do not exist on FAQ.

424.  Hospitals have offered cash bonuses for nursing referrals.

425.  Hospitals are demanding the vaccine to be taken from young nursing students from area colleges who must work in their hospitals for clinicals.

426.  OB/GYN groups from the hospitals refuse to write medical exemptions for their pregnant patients even when there are no studies how the vaccines might harm a child.

427.  The hospital workers are witnessing firsthand every day the vaccinated having adverse reactions.

428.  The hospitals will manipulate the Covid-19 testing on those workers who refuse to take the vaccination.

429.  Hospitals are delaying the determination of workers declination forms.

430.  Hospitals through their actions are causing patient care issues by the workers being turned against each other.

431.  The entire purpose of the vaccine is to protect the person taking it, not others.

432.  If masks work as claimed, why are workers not allowed to wear the exact same type of mask they have been wearing for a year and a half.

433.  The test uses a Q-tip with a known carcinogen, ethylene oxide. Repeat tests expose workers to this at levels with an unknown risk.

434.  The mandate for boosters could go on and on.

435.  There is no determination between the Covid-19 virus and the flu virus.

436.  Most Covid hospitalizations are people with comorbid conditions. Workers who are healthy, have had Covid, eat well, exercise and take care of themselves have more than enough of an immune system to defend themselves.

437.  The statistics from WHO reflect death by diabetes is a great issue than death by Covid. It is three times more deadly.

438.  The package inserts from the vaccines are blank.

439.  If you have to persuade, remind, pressure, lie, incentivize, coerce, bully, social shame, guilty trip, threaten, punish and/or pay people to gain compliance, you can be certain what is being promoted is not in your best interest.

440.  The vaccine cards being used don't have one, but four places for shots. Four shots planned from the beginning?

441.  These hospitals receive tax exempt status and therefore receive special treatment from the government.

442.  Local news media prepares constant puff community pieces for tristate hospitals while receiving after car sellers, the most advertising dollars.

443.  According to VAERS analysis on August 6, 2021 for through July 30, 2021:

*US Data Only

| High Level Summary | Covid-19 Vaccines Dec. 2020- Present | All Other Vaccines 1990- Present | Covid 19 Vaccines Dec. 2020- Present | All Other Vaccines 1990-Present |
|---|---|---|---|---|
| | | | | |

| Number of Adverse Reactions | 571,831 | 812,603 | 451,049 | 712,541 |
|---|---|---|---|---|
| Number of Life Threatening Events | 13,139 | 13,383 | 7,603 | 9,546 |
| Number of Hospitalizations | 51,242 | 77,634 | 26,798 | 37,594 |
| Number of Deaths | 12,791 | 8,867 | 5,859 | 5,005 |
| Number of Permanent Disabilities After Vaccine | 16,044 | 18,944 | 6,654 | 11,895 |
| Number of Office Visits | 95,886 | 42,049 | 90,432 | 40,793 |
| Number of Emergency Room/Dept. Visits | 70,610 | 208,849 | 61,956 | 199,944 |

444.  Hospitals are refusing to accept responsibility for adverse reactions for vaccines.

445.  Patients who are fully vaccinated aren't being swabbed for Covid prior to procedures.

446.  The most knowledgeable segment of our community about a vaccine, healthcare workers, are resisting the vaccine.

447.  Covid 19 now has provable treatments.

448.  Hospitals are counting unvaccinated Covid admissions and death, not vaccinated.

449.  During the Covid 19 pandemic, the seasonal flue miraculously disappeared.

450.  Hospitals are refusing psychological medical exemptions.

451.  Doctors are refusing to write medical exemptions for workers who have allergies to flu vaccines.

452.  Hospitals are offering bonuses.

453.    Hospitals have been engaged and continue to be engaged in massive manipulation of Covid 19 related numbers.

454.    Hospitals have lied about how many Covid 19 patients are in their hospitals.

455.    Hospitals have lied about the number of vaccinated patients with Covid 19.

456.    Hospitals have had their physician groups hospitalize patients that should not be hospitalized.

457.    Hospitals have made false reports to state and federal agencies about their Covid 19 data. This is criminal conduct.

458.    Hospitals have lied to the media and public to manipulate the public through fear to become vaccinated and support their hospitals.

**459.    To lie and to coerce; to manipulate; to bribe and the healthcare workers who in 2020 were HEROES to force them to take a vaccine or be FIRED, DISCHARGED, DISMISSED from not only their job, but lose their careers is the most despicable act against workers in American history.**

460.    The entire out of control vaccination campaign is predicated by the hospitals relying upon employment at will and that any employee can reject the vaccination and face discharge in lieu of vaccination. That cannot stand in these circumstances.

461.    The U.S. government and state government has ordered these vaccinations. But for the government mandates, there would not have to be a healthcare worker mandate.

462.    In fact, from January 1, 2020 to the present, healthcare workers took care of patients with protocols which worked just fine without the need of vaccination.

463.    The mandate does not come from the hospitals. It comes from the government who cannot force vaccinations.

464. There is in fact a criminal conspiracy between the U.S. government, state government, media, pharma and corporate healthcare to line their pockets at the expense of the healthcare workers and American taxpayers.

465. These entities have collaborated and conspired together to falsely report and declare information to INDUCE the American public and healthcare workers to take the vaccine.

466. They do so knowing the adverse consequences and risks of the vaccine outweigh the benefit.

467. They want workers who work at home to be vaccinated.

468. They want workers who have protective antibodies to be vaccinated.

469. They want pregnant women to be vaccinated.

470. They want workers who are immunocompromised to be vaccinated.

471. They want workers who have no patient contact to be vaccinated.

472. Hospitals also have told their physician groups to deny all medical exemptions.

473. This is an unethical and tortious interference with the healthcare of their very own workers.

474. Hospitals have violated HIPAA in their investigation of their workers, including illegally looking at their electronic healthcare charts.

475. Hospitals are now changing policies on an even daily basis to manipulate and threaten workers.

476. Hospitals attempt to have healthcare workers become insubordinate so they could fire them and avoid unemployment.

477. Hospitals have participated in clinical trials of the vaccines creating conflicts.

478.    Hospitals have changes policies on temperature and testing to reporting so workers can work sick.

479.    Those who have received the vaccination include those who did so under severe duress.

480.    The CDC and NIH have participated in the fraud upon the public with refusal to release information and misrepresenting other information.

481.    The Hospitals are causing healthcare workers to leave the field and the very collapse of healthcare system is at stake rom that- not Covid 19.

482.    Social media has perpetrated and controlled only one message on Covid, the message of Joe Biden's administration, CDC, Dr. Fauci, corporate healthcare, federal and state governments and pharma.

483.    The hospital vaccine requirement is "an affront to human dignity and personal freedom because it violates a person's basic right to control our bodies."

484.    In America's free society all people have the right to decide their own medical treatment — especially to decide what to inject into their bodies. And every person has the right to make that decision voluntarily, free from coercion by anyone, and to be fully informed of the benefits and especially the risks of that decision.

485.    The vaccine policy is a violation of the right to informed consent and the right to refuse unwanted medical treatments.

486.    This vaccine mandate undermines our Constitution and Bill of Rights by denying workers the freedom to make their own medical decisions.

487.    No one should be forced or coerced into accepting any medical procedure against their wishes. When the low risk to young adults from COVID and the known and

unknown risks from the vaccines are taken into account, the hospitals' actions recklessly endanger its workers.

488.    As confirmed by the Centers for Disease Control and Prevention, young people are at minimal risk of long-term effects or death from COVID and have a 99.985% survival rate if infected with the virus.

489.    However, the most recent COVID vaccination injury update from the Vaccine Adverse Events Reporting System (VAERS) — one of the tracking systems of the U.S. Department of Health and Human Services — shows that between mid-December, 2020 and August 6, 2021, 559,040 adverse events were reported to VAERS, including 12,791 reports of deaths, many in young people ages 12 to 25.

490.    In comparison, after approximately 50 total deaths following swine flu vaccination in 1976, that vaccine campaign was immediately aborted.

491.    Unjustified fear and insatiable greed drive the vaccine industry, especially now, during the pandemic. This has created an opportunity for manufacturers to bring to market expensive, novel and patentable drugs, vaccines, biologics, treatments and medical devices that will reap huge profits.

492.    It is incredibly unnerving that the hospitals would play Russian Roulette with the lives of the workers it claims to protect, "with greed and ties to Big Pharma being prioritized over our safety and free will."

493.    The hospitals believe they can do what they want because the state and federal government and media will leave them to do whatever they want.

494.    The hospitals are out of control bullies and political and criminal gangsters.

495.    The hospitals are having issues NOT because there are no beds, but because of not enough staff caused in part by their policies.

496.    The hospitals have in their religious and medical exemptions and waivers, releases the language including: "I want to receive the Covid 19 vaccination." This is false.

497.    The hospitals are holding fraudulent question and answer sessions.

498.    On July 8, 2021, Secretary Xavier Becerra stated "To be clear: government has no database tracking who is vaccinated. We're encouraging people to step up to protect themselves, others by getting vaccinated. It's the best way to save lives and end this pandemic." This is a lie as each state has a database and it is easily accessible to track who has been vaccinated.

499.    The hospitals all played along with government with Covid diagnosis for everything from a hangnail to a massive heart attack. Now they have to make you jump through the hoop or they will have to give all the government Covid money back. The hospital sold its soul to the devil for their corporate benefit.

500.    Providers are resuming telehealth visits, "due to increasing Covid cases." An office does not need as many staff members since there would be minimal to no patients coming in. if there is a mass firing due to rejecting the vaccine, they can pull office staff to cover hospital staff.

501.    The Vax-a-million, announced by Ohio Governor Mike Dewine on May 12, gave $1 million to five vaccinated adults and a college scholarship to five vaccinated youth over five weeks. The state spent about $5.6 million on the effort.

502.    Management and physicians were told they can't protest or speak up because it's against leadership and reputation.

503.    Hospitals are using contract paybacks to force vaccinations.

504.    Masks are now proven to be only a 10% protection.

505.    Covid 19 vaccines are increasing the risk of hospitalization and death.

506.    Antibody tests have been used to avoid measles, mumps and rubella vaccines.

507.    Based upon this chronology of events, the American public and well educated and trained healthcare workers (40% in the tristate believed not vaccinated by August 1, 2021) have good reason not to trust the vaccine and those who promote it.

508.    Defendants are mandating their employees be fully vaccinated by October 1, 2021 or be discharged.  The first shot they are requiring is by September 1, 2021.

509.    Defendants are making threats to employees that if they are terminated for refusing the vaccine then they will be forfeiting all PTO time they would have received as a payout.

510.    Defendants' Physicians are all refusing to sign any exemption forms for employees.

511.    Employees report that bribes are being made to them to get the vaccine.

512.    Employees state that all inpatient admissions are being tested for COVID-19 to help increase their numbers.

513.    Patients are not receiving proper care due to the lack of staff.

514.    A hospice employee states they are receiving more patients who are fully vaccinated than not.  These patients are presenting with organ failure.

74

515.     An employee states that if you call in and state that someone in your immediate household has tested positive for COVID-19, you are being asked to report if you are asymptomatic.

516.     Employees are being mandated to receive the vaccine regardless of their medical condition.

517.     Defendants are knowingly falsifying numbers for COVID-19 positive patients.

518.     Defendants are actions wholesale are unethical, illegal and immoral.

519.     Defendants are violating medical autonomy.

520.     Defendants are falsifying Informed Consent to those receiving the vaccine.

521.     Defendants' leaderships are putting great peer pressure on employees to receive the vaccination.

522.     Defendants are using guilt to pressure employees.

523.     Defendants are ridiculing associates by falsely blaming and defaming them for "spreading Covid."

524.     Defendants are knowingly naming unvaccinated associates as "unvaccinated pandemic."

525.     Defendants are refusing other alternatives to mandate the Covid 19 vaccines.

526.     Defendants have a current nursing and staffing shortage.

527.     Defendants are knowingly holding career and salary as leverage to vaccinate.

528.     Defendants are coercing all associates with threats.

529.     Defendants are knowingly creating animosity between the vaccinated and unvaccinated associates.

530.    Defendants are knowingly creating mental health distress in associates regarding Covid 19.

531.    Defendants' mandates are creating home issues with associates' spouses and significant others.

532.    Defendants are forcing their associates to undergo a medical procedure they do not want.

533.    Defendants are guilting their associates by stating "Your responsibility and duty to protect the community and your families."

534.    Defendants are knowingly putting patients' lives at risk by the vaccine mandate.

535.    Defendants are threatening to terminate contracts of contracting companies that do not mandate vaccine.

536.    Defendants' directors are approaching unvaccinated associates questioning why they aren't vaccinated.

537.    Defendants' physicians are knowingly harassing unvaccinated associates.

538.    Defendants refuse to count the number of adverse reactions to Covid 19 vaccines.

539.    Defendants are advising associates and patients any type of reactions from vaccine are "just coincidental."

540.    Defendants are advising associates that are COVID positive, with minimal symptoms, to report to work.

541.    Defendants are knowingly basing vaccination numbers on "national average."

542.    Defendants are refusing to admit patients for adverse side effects of COVID-19 vaccine.

543.    Defendants are refusing to document the reactions from the vaccine.

544.     Defendants knowingly have fully vaccinated patients dying from COVID-19.

545.     Defendants are knowingly putting careers in jeopardy.

546.     Defendants are knowingly causing healthcare students to fail courses due to mandate.

547.     Defendants are knowingly putting healthcare students in financial debt due to mandate.

548.     Defendants' physicians are telling associates/patients "the side effects are not from the jab."

549.     Defendants are advising associates not to post on social media accounts regarding vaccines/protests.

550.     Defendants' associates are not allowed to have an opinion that goes against corporate narratives.

551.     Defendants have voiced that terminated associates will be unable to collect their retirement funds.

552.     Defendants were paid a bribe by the government to not fight the closures during the pandemic.

553.     Personal and philosophical reasons for not receiving Covid 19 vaccine will not be granted.

554.     Defendants are knowingly putting patient safety, health and safe care at risk.

**555.     Defendants should be ashamed of the "harm" they are causing to countless HEROES by intentionally and criminally, with no backbone, refusing to give legitimate healthcare exemptions.**

556.     Covid is not spreading among healthcare workers.

557.     Healthcare workers love their jobs and their careers. They have a right to work in their career. If healthcare is a right, their right to work in it is also a right.

## CRIMES COMMITTED BY DEFENDANTS

558.     Defendants have committed the following criminal offenses: healthcare fraud (18 U.S.C. 1347), false statements relating to healthcare matters (18 U.S.C. 1035), insurance fraud (R.C. 2913.47), Medicaid fraud (R.C. 2913.40), telecommunications fraud (R.C. 2913.05, criminal coercion (R.C. 2905.12), wire fraud (18 U.S.C. 1343) and mail fraud (18 U.S.C. 1341).

## CAUSES OF ACTION

## I.     VIOLATION OF THE RIGHT TO REFUSE UNWANTED AND MEDICALLY UNNECESSARY MEDICAL CARE

559.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

560.     The Policy requires Plaintiffs to take a vaccine without their consent, thereby depriving them of their ability to refuse unwanted medical care.

561.     The Supreme Court has recognized that the Ninth and Fourteenth Amendments protect an individual's right to privacy. A "forcible injection ... into a nonconsenting person's body represents a substantial interference with that person's liberty[.]" *Washington v. Harper*, 494 U.S. 210, 229 (1990).

562.     The common law baseline is also a relevant touchstone out of which grew the relevant constitutional law. *See, e.g., Cruzan v. Dir., Mo. Dept of Public Health*, 497 U.S. 261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery'). *See* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 9, pp. 39-42 (5th

ed. 1984).); *Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his own body; a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.').

563.    Subsequent Supreme Court decisions have made explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." *Cruzan*, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same).

564.    This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997).

565.    The Court has explained that the right to refuse medical care derives from the "well established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

566.    Coercing employees to receive an EUA vaccine for a virus that presents a near-zero risk of illness or death to them and which they are exceedingly unlikely to pass on to others, because of the safety measures inherent in the hospital setting and because some of those employees already possess natural immunity to the virus, violates the liberty and privacy interests that the Ninth and Fourteenth Amendments protect.

567.    When a policy implicates a fundamental right, through coercion or otherwise, the strict scrutiny standard "applies [;] a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017).

568.     Defendants cannot show that they have a compelling interest in coercing Plaintiffs into taking a COVID-19 vaccine, because by the nature of their employment, Plaintiffs already use all the tools available to prevent the spreading of infections, Covid-19 in particular.

569.     The CDC recently acknowledged that vaccinated individuals appear to be spreading COVID-19 at rates similar to unvaccinated (but not naturally immune) people. That further underscores the arbitrary nature of the Policy. [55]

570.     Likewise, recent data from Israel suggest that individuals who receive the Pfizer Vaccine can pass the virus onto others a mere few months after receiving it. Yet, as of the writing of this Complaint, the CDC is not requiring booster shots.[56]

571.     Even if Defendants could show a compelling interest in mandating vaccination, the Policy is not narrowly tailored to achieve such an interest. It ignores individual factors increasing (age, co-morbidity) or decreasing (having recovered from Covid) employees risks to themselves or others.

572.     Had a vaccine been available then, such a blanket mandate may have appropriate when little was known at the beginning of the pandemic, but not when health safety measures have proven effective to reduce contamination and much is left unknow about the risks of the vaccines.

573.     The Policy forces Plaintiffs to choose between their health, their personal autonomy, and their careers.

---

[55] Where's the data? WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ (last visited August 12, 2021).
[56] Joint CDC and FDA Statement on Vaccine Boosters | HHS.gov (last visited August 12, 2021).

574.     Plaintiffs will suffer damage from Defendants' conduct. There is no adequate remedy at law, as there are no damages that could compensate Plaintiffs for the deprivation of their constitutional rights. They will suffer irreparable harm unless this Court enjoins Defendants from enforcing their Policy.

575.     Plaintiffs are entitled to a judgment declaring that the Policy violates their constitutional right to refuse medical treatment and an injunction restraining Defendants' enforcement of the Policy.

## II.     CRIMINAL COERCION

576.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

577.     Plaintiffs have the legal right to refuse to receive the Covid-19 vaccine.

578.     Defendants acted with the intent to compel Plaintiffs to receive the Covid-19 vaccine with the threat of both termination and the subsequent impairment to the Plaintiffs' reputations in the medical field.

579.     The Defendants threatened Plaintiffs that unless they receive the Covid-19 "vaccine," their employment would be subsequently terminated.

580.     The Defendants knew that by singling out any employee whom had not received the vaccine, employees would be compelled to "comply" under the threatening pressure of being a virtual outcast amongst their colleagues.

581.     Defendants utilized the threat of being ostracized against its own physicians/employees to coerce them into "complying" and getting the Covid-19 "vaccine."

582.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

583.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

584.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

585.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

### III.     FRAUD IN THE CONCEALMENT AND CONSTRUCTIVE FRAUD

586.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

587.     The misrepresentations and/or concealments were made during Defendants' communications with Plaintiffs.

588.     Defendants were fully aware and/or recklessly ignored the inaccuracy of both the internal and external reporting regarding the Covid-19 numbers. These numbers include, but are not limited to;

        a.   Covid-19 infection rates for the vaccinated/ unvaccinated,

        b.   Covid-19 death rates for the vaccinate/ unvaccinated,

        c.   ICU bed occupancy attributable to vaccinated vs. non-vaccinated patients,

        d.   Covid-19 vaccine adverse effects,

589.     Defendants willfully concealed, covered up, destroyed, willfully and/or recklessly ignored the obvious evidence which, unfortunately for the Defendants, was contrary to the Defendant Hospitals' intended narrative.

590.     Defendants directly and indirectly, orally, and in writing, threatened, coerced, and pressured Plaintiffs to not discuss, disclose, or reveal evidence of the "reality" of Covid-19 and the Covid-19 vaccine and its impact on the general population.

591.     Defendant Hospitals had a monetary interest in concealing the truth.

592.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

593.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

594.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

595.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

### IV.     TORTIOUS INTERFERENCE WITH PERSONAL HEALTHCARE

596.     The Defendants have unilaterally declared there will be no medical exemptions and have ordered their physician groups to NOT grant medical exemptions no matter the facts. This is evil, criminal and actionable.

### V.     FRAUDULENT INDUCEMENT

597.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

598.    Even though they are aware of the potential serious risks associated with Covid vaccines, in order to induce Plaintiffs to get vaccinated, Defendants have concealed those risks and misrepresented the benefits.

599.    In fact, the newness of these vaccines and the fact that so little is known as of yet about the risks associated with them makes it impossible for Defendants to comply with their duty to disclose the risks and benefits associated with them

600.    The safety and benefits of a vaccine are representations that are material to the decision of a person to get such vaccine.

601.    Plaintiffs relied and WILL continue to rely on Defendants' concealment. Had all the risks and lack of benefits (specially for those Plaintiffs who have recovered from Covid-19) been disclosed (if they even could), Plaintiffs would not take or have taken the vaccines.

602.    Plaintiffs have been and will continue to be harmed by Defendants' concealment in that they were, are and will be forced, to undergo a procedure that they would not have wanted or do not want.

603.    Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

**604.** Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless conduct.

## VI. CIVIL AND CRIMINAL CONSPIRACY

605. Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

606. Defendants acted in concert – conspired- in imposing the vaccine mandate and forcing Plaintiffs to choose between their job or their health.

607. Defendants' scheme seeks to achieve an illegal goal – the imposition of a vaccine that is experimental and in violation of Plaintiff's constitutional rights.

608. Defendants' actions are not reasonable in that they are not necessary to achieve the goal of limiting the spread of the Covid-19 vaccine.

609. Because of Defendants' concerted actions, Plaintiffs who do not want the vaccine will not be able to work in other hospitals. Therefore, there is no meaningful choices for affected Plaintiffs in their field of employment.

610. Defendants are in fact taking away Plaintiffs' livelihood.

**611.** As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

**612.** Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

613.    Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless condition surrounding Plaintiffs' termination.

## VII.    CIVIL LIABILITY FOR CRIMINAL CONDUCT  KY "PENALTY NO BAR TO CIVIL RECOVERY" (KY. REV. STAT. ANN. § 446.070/ OH "CIVIL ACTION FOR DAMAGES FOR CRIMINAL ACT" (O.R.C. § 2307.60)

614.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

615.    Plaintiffs have been injured by the violation of all of the preceding and/or following statutes.

616.    Consequently, Plaintiffs are entitled to such damages that have been sustained by reason of the violation per (statute).

617.    As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

618.    Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

619.    Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

620.    Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## VIII.   VIOLATION OF AT-WILL EMPLOYMENT DOCTRINE/PUBLIC POLICY EXCEPTION

**621.** Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

**622.** Defendants' Policy is in direct violation of Federal law, specifically 21 U.S. Code § 360bbb-3 – Authorization for medical products for use in emergencies.

**623.** That law states that where a medical product is "unapproved" then no one may be mandated to take it. At Section (e)(1)(A) of the aforementioned statute it states:

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following: (i) Appropriate conditions designed to ensure that the health care professionals administering the product are informed – (ii) of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and (iii) of the alternatives to the product that are available, and of their benefits and risks. (iv) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed— (v) that the Secretary has authorized the emergency use of the product; (vi) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and (vii) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." (emphasis added).

87

624.        Defendants violated at least two quoted sections (ii and iii). Defendants did not advise Plaintiffs of the "known and potential benefits and risks of such emergency use of the product, and of the extent to which such benefits and risks are unknown" of the COVID-19 experimental vaccine. Additionally, Plaintiffs are not provided "the option to accept or refuse administration of the..." experimental vaccine as a condition for employment. Such conduct is in violation of the public policy of this state and is the basis for an exception to the at-will employment doctrine.

625.        It is questionable for Defendants to require its employees to take the emergency experimental vaccine at this stage of the pandemic where so many people are vaccinated and/or have recovered from vaccines and where Plaintiffs evolved in an environment where protective measures in place where deemed sufficient to prevent the spread of the disease prior to the EUA of the vaccines.

626.        Defendants' Policy is also in direct violation of Plaintiffs' right to receive unwanted and unnecessary medical care as afforded by the Ninth and Fourteenth Amendments protecting an individual's right to privacy.

627.        Plaintiffs suffered damages in an amount in an amount to be determined at trial.

628.        Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

629.        Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless conduct.

## IX. BREACH OF FIDUCIARY DUTY AND NEGLIGENCE

630.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

631.     Based upon all facts pled and to be proven, Defendants had a fiduciary duty by their position to protect Plaintiffs and were in positions of responsibility and trust.

632.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

633.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

634.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

635.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## X. DURESS

636.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

637.     Defendants created the illusory choice Plaintiffs to choose whether or not to receive the Covid-19 vaccine.

638.     Defendants forced employees to comply and receive the Covid-19 vaccine.

639.     Defendants are forcing Plaintiffs to receive the Covid-19 vaccine under economic duress.

89

640.    As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

641.    Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

642.    Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

643.    Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## XI.    VIOLATION OF THE SHERMAN ACT 15 U.S.C. § 1, *et seq.*

644.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

645.    Section 1 of the Sherman Act regulates concerted activity between two or more entities, outlawing "[e]very contract, combination ... or conspiracy, in restraint of trade," 15 U.S.C. § 1.

646.    To prevail on a claim under § 1, a plaintiff must prove: (1) a contract, combination, or conspiracy; (2) producing adverse, anticompetitive effects in the relevant market; and (3) resulting in injury. *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 939 (6th Cir. 2016) citing *See Expert Masonry, Inc. v. Boone Cty., Ky.*, 440 F.3d 336, 342 (6th Cir.2006).

647.    Hospitals acted in concert – conspired-  in imposing the vaccine mandate and forcing Plaintiffs to choose between their job or their health.

648.    Defendants' scheme seeks to achieve an illegal goal – the imposition of a vaccine that is experimental and in violation of Plaintiff's constitutional rights.

649.    Defendants' actions are not reasonable in that they are not necessary to achieve the goal of limiting the spread of the Covid-19 vaccine.

650.    Because of Defendants' concerted actions, Plaintiffs who do not want the vaccine will not be able to work in other hospitals. Therefore, there is no meaningful choices for affected Plaintiffs in their field of employment.

651.    Defendants are in fact taking away Plaintiffs' livelihood.

652.    As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

653.    Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

654.    Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless conduct.

655.    Plaintiffs are also entitled to recover treble damages as a result of Defendants' concerted actions.

## XII.    DECLARATORY RELIEF

656.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

91

657.    Plaintiffs request the Court issue declaratory relief that (a.) 21 U.S. Code § 360bbb-3, Section (e)(1)(A) does not permit Defendants to coerce an employee to accept an FDA unapproved vaccine on penalty of termination or other sanctions. (b.) The doctrine of federal preemption invalidates and voids the Policy of each of Defendants.

658.    Accordingly, Plaintiffs request a declaration that each of Defendants' above-Policy is invalid.

### XIII.  INJUNCTIVE RELIEF

659.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

660.    Plaintiffs have been threatened for choosing not to take an FDA unapproved experimental vaccine which federal law states cannot be mandated because insufficient trials have been conducted and its long-term effects are not known. Currently there are many new reports of adverse effects and even deaths resulting from the experimental vaccine. Plaintiffs might be terminated for refusing to take an experimental vaccine which federal law states cannot be mandated, constitutes a retaliatory discharge under Ohio/Kentucky law and a violation of their constitutional right under the Ninth and Fourteenth Amendment of the United States Constitution.

661.    "The purpose of a preliminary injunction is simply to preserve the status quo[,]" *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004), *i.e.*, "to preserve the parties' relative positions in order to prevent irreparable injury prior to trial." *Montgomery v. Carr*, 848 F. Supp. 770, 779 (S.D. Ohio 1993).

662.    Irreparable injury to the Plaintiffs will result from their being obligated to take the vaccine or be terminated.

663.    Therefore, Plaintiffs respectfully request this Court issue a temporary injunction, after notice and hearing, restraining the Defendants, their agents, representatives, or anyone acting on their behalf until further order of the Court from requiring them be vaccinated or terminating Plaintiffs for the sole reason of their refusal to be vaccinated.

## XIV.  CLASS ACTION

664.    All elements of Civil Rule 23 apply:

The proposed class is all employees of Defendants who do not want the vaccinations for Covid which is (a) so numerous that joinder of all members is impracticable, (b) there are questions of law or fact common to the class, (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (d) the representative parties will fairly and adequately protest the interests of the class. Ky. R. Civ. P. 23.01. This class is believed to be 4,000. The Plaintiffs can represent the class.

665.    (a) The prosecution of separate actions by or against individual members of the class would create a risk of

666.    (i) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or,

667.    (ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

668.     (b) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

669.     (c) the court should find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

670.     (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

671.     (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

672.     (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

673.     (iv) the difficulties likely to be encountered in the management of a class action.

## XV.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OUTRAGE)

674.     Defendants' conduct as described above was intentional and reckless.

675.     Defendants' behavior is outrageous and offends against the generally accepted standards of morality.

676.     It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

677.     Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## XVI.   VIOLATION OF THE UNCONSTITUTIONAL CONDITIONS DOCTRINE AND THE FOURTEENTH AMENDMENT'S RIGHT TO DUE PROCESS

678.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

679.     Unconstitutional conditions case law often references the existence of varying degrees of coercion. According to that body of law, Defendant cannot impair Plaintiffs' right to refuse medical care through subtle forms of coercion any more than it could through an explicit mandate. See, e.g., Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595 (2013) ("[U]nconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them"); Memorial Hosp. v. Maricopa Cty., 415 U.S. 250 (1974) ("[An] overarching principle, known as the unconstitutional conditions doctrine ... vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up").

680.     The Due Process Clause of the Fourteenth Amendment provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law ... ." U.S. Const., amend. XIV, sec. 1.

681.     Plaintiffs possesses both a liberty interest in his bodily integrity.

682.     It is less appreciated in legal circles that, to prevail, unconstitutional conditions claims do not need to establish that a challenged government policy amounts to coercion. Instead, it is sufficient that the state policy burden a constitutional right by imposing undue pressure on an otherwise voluntary choice with a nexus to the exercise of a constitutional right. In other words, the presence of some remaining voluntarism after new conditions are imposed on the exercise of a constitutional right does not stand as a barrier to establishing successful unconstitutional conditions claim. This is especially true when a government

95

actor couples an unconstitutional condition with a procedural system stacked against the right-holder.

683.     For example, in Speiser v. Randall, 357 U.S. 513 (1958), the Court invalidated a loyalty oath imposed as a condition for veterans to obtain a state property tax exemption, even though (a) California citizens were not required to own real property, of course; (b) California veterans could freely opt not to seek the exemption and simply pay the unadorned tax; and (c) California was not even obligated to provide veterans with the exemption but rather the exemption was a mere privilege.

684.     The Speiser Court deemed the oath condition unconstitutional in part because the burden to establish qualification for the exemption was placed on applicants. See id. at 522. The question the Supreme Court saw itself deciding was "whether this allocation of the burden of proof, on an issue concerning freedom of speech, falls short of the requirements of due process." Id. at 523.

685.     The Court addressed this question by stating the guiding principle that

> Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance .... [But] Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt.

Id. at 525-26.

686.     Here, the analogue of the criminal defendant rights of "transcending value" referenced in Speiser are the liberty rights of all persons to be free of unconsented-to bodily intrusions and medical interventions. This means that unconstitutional conditions doctrine and due process rights combine to invalidate the Policy. That result occurs because Defendants have not and cannot show that the school's forcing Plaintiffs to take the vaccine

reduces any risk that he will become infected with and spread the virus. See also Lawrence

v. Texas, 539 U.S. 558, 562 (2003) (The Due Process Clause protects "liberty of the person

both in its spatial and in its more transcendent dimensions").

687.    Similar to the California law in Speiser "creat[ing] the danger that ... legitimate

utterance will be penalized," 357 U.S. at 526, the process Defendants have established in

relation to taking COVID-19 vaccines poses dangers to Plaintiffs' health (and thus to their

liberty interests) as well as threatening their with various forms of penalties and other

detriments.

688.    Indeed, more so than in Speiser, the factual issues involved in this case are complex.

"How can a claimant ... possibly sustain the burden of proving the negative of these

complex factual elements? In practical operation, therefore, this procedural device must

necessarily produce a result which the State could not command directly." Id. There is

perhaps no better encapsulation by the Supreme Court of how unconstitutional conditions

doctrine and Due Process can and do intersect and reinforce one another. See also id. at

529 ("The State clearly has no such compelling interest at stake as to justify a short-cut

procedure which must inevitably result in suppressing protected speech."). The

Commonwealth of Kentucky similarly possesses no compelling interest that could justify

its defective Policy that will inevitably result in at least some unwarranted medical

intrusions into the bodies of members of the Defendants community.

689.    For these reasons, Defendants cannot by means of its Policy effectively flip the

burden of proof and require Plaintiffs to prove that it is safe for him to work without being

vaccinated. And setting up such a process, which is what Defendant's Policy does, thereby

represents a concurrent procedural due process violation and an unconstitutional condition burdening his liberty interests to be free of unwanted medical interventions.

690.      Speiser also rests on the mismatch between the loyalty oath California required and the grant of a property tax exemption to veterans. "[T]he State is powerless to erase the service which the veteran has rendered his country; though he be denied a tax exemption, he remains a veteran." Id. at 528. 36.

## XVII. VIOLATION OF THE SUPREMACY CLAUSE

691.      Plaintiff realleges and incorporates by reference all the foregoing allegations as though fully set forth herein.

692.      Defendants' Policy requires Plaintiffs to receive a vaccine in order to work effectively without regard to their natural immunity or the health risks they face.

693.      They also must divulge personal medical information by uploading it into an online portal and is threatened with disciplinary action if he declines to comply with these arbitrary mandates.

694.      The Policy thus coerces or, at the very least, unduly pressures Plaintiffs into getting a vaccine that FDA approved only for emergency use.

695.      The United States Constitution and federal laws are the "Supreme Law of the Land" and supersede the constitutions and laws of any state. U.S. Const. art. VI, cl. 2.

696.      "State law is pre-empted to the extent that it actually conflicts with federal law." English v. General Elec. Co., 496 U.S. 72, 79 (1990) (internal citations and quotation marks omitted).

697.     Federal law need not contain an express statement of intent to preempt state law for a court to find any conflicting state action invalid under the Supremacy Clause. See Geier v. American Honda, 520 U.S. 861, 867-68 (2000).

698.     Rather, federal law preempts any state law that creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona v. United States, 567 U.S. 387, 399-400 (2012).

699.     The EUA statute mandates informed and voluntary consent. See John Doe No. 1 v. Rumsfeld, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (allowing use of anthrax vaccine pursuant to EUA "on a voluntary basis"). See also 21 U.S.C. § 360bbb3(e)(1)(A)(ii).

700.     It expressly states that recipients of products approved for use under it be informed of the "option to accept or refuse administration," and of the "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." Id.

701.     Since Defendants' Policy coerces Plaintiffs by making enjoyment of their constitutionally and statutorily protected consent rights contingent upon receiving an experimental vaccine, it cannot be reconciled with the letter or spirit of the EUA statute. See 21 U.S.C. § 360bbb-3.

702.     The conflict between the Policy and the EUA statute is particularly stark given that the statute's informed consent language requires that recipients be given the "option to refuse" the EUA product. That is at odds with the Policy's forcing Plaintiffs to sustain significant injury to their career if they do not want to take the vaccine (in light of masking, frequent testing, social distancing, and looming disciplinary action).

703. Put differently, the Policy frustrates the objectives of the EUA process. See Geier, 520 U.S. at 873 (citing Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

704. As noted above, OLC made a memorandum available to the public on July 27, 2021 (dated July 6, 2021) opining that the EUA status of a medical product does not preclude vaccine mandates that might be imposed by either the public or private sectors. See "Memorandum Opinion for the Deputy Counsel to the President," Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization (July 6, 2021) (OLC Op.) at 7-13, available at https://www.justice.gov/olc/file/1415446/download (last visited Aug.1, 2021).

705. Of course, the separation of powers dictates that this Court is not bound by the OLC Opinion—an advisory opinion written by the Executive Branch for the Executive Branch. See Citizens for Responsibility & Ethics in Wash. v. Office of Admin., 249 F.R.D. 1 (D.C. Cir. 2008) ("OLC opinions are not binding on the courts[; though] they are binding on the executive branch until withdrawn by the Attorney General or overruled by the courts[.]") (cleaned up).

706. Relatedly, the Justice Department until only days ago took a very different approach. See Attorney General Memorandum, Balancing Public Safety with the Preservation of Civil Rights (Apr. 27, 2020), available at https://www.justice.gov/opa/page/ file/1271456/download (last visited Aug. 1, 2021, 2021) ("If a state or local ordinance crosses the line from an appropriate exercise of authority to stop the spread of COVID-19 into an overbearing infringement of constitutional and statutory protections, the Department of Justice may have an obligation to address that overreach in federal court."). See also Kevin Liptak, CNN, Biden Jumps

Into Vaccine Mandate Debate as VA Requires Health Workers to Get Vaccinated (July 26, 2021) ("The [new OLC] opinion marks a reversal from the previous administration. Last year, Attorney General William Barr used the Justice Department's legal power to try to fight certain Covid restrictions, including joining some businesses that sought to overturn state mask mandates."), available at cnn.it/37bwAbl (last visited Aug. 1, 2021).

707.    Moreover, the OLC Opinion is entirely silent on the issue of preemption. As such, it cannot be read even as offering a potentially persuasive legal view on whether the Defendant Policy is preempted by the EUA statute or not. In light of what this Count pleads, the OLC opinion is a legal non sequitur.

708.    The OLC Opinion is also premised on faulty reasoning. While recognizing that EUA products have "not yet been generally approved as safe and effective," and that recipients must be given "the option to accept or refuse administration of the product," the Opinion nevertheless maintains that the EUA vaccines can be mandated. OLC Op. at 3-4, 7.

709.    According to OLC, the requirement that recipients be "informed" of their right to refuse the product does not mean that an administrator is precluded from mandating the vaccine. All that an administrator must do, in OLC's view, is tell the recipient they have the option to refuse the vaccine. Id. at 7-13.[57] That facile interpretation sidesteps the fact that the Policy's employment consequences effectively coerce or at least unconstitutionally leverage the community into taking the vaccine, reducing to nothingness both the

---

[57] The OLC opinion is as irrelevant to the constitutional questions in this case posed by Counts I and II as it is to the preemption questions in Count III. For it was no answer in Speiser to the due process and unconstitutional conditions problems created by California's property tax exemption and oath system to quickly breathe a sigh of relief because California tax authorities could simply tell veterans applying for the tax exemption that they could just go away and forgo the tax exemption. The Constitution and the text of congressional statutes cannot be so easily dodged.

constitutional and statutory rights of informed consent. This approach of stating the obvious but ignoring competing arguments is likely why the Opinion remained mum on the doctrine of preemption.

710.     Recognizing the illogic of the Opinion and its inability to square its construction with the text of the EUA statute, OLC admits that its "reading ... does not fully explain why Congress created a scheme in which potential users of the product would be informed that they have 'the option to accept or refuse' the product." Id. at 10. This understatement would be droll but for the serious rights at stake, especially given that the elephant in the room—which the OLC Opinion ignores—is the Supremacy Clause and the preemption doctrine that Clause powers. In truth, Congress called for potential users to be informed precisely so that they could refuse to receive an EUA product. OLC's obtuse reading of the statute blinks reality.

711.     In other words, nothing in the OLC Opinion addresses the fact that if it were taken as a blanket authorization for state and local governments to impose vaccine mandates, a vital portion of the EUA statute's text would be rendered superfluous. See, e.g., TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (cleaned up).

712.     Yet, OLC turns around and claims that Congress would have explicitly stated if it intended to prohibit mandates for EUA products. Id. at 8-9. But Congress did say so. The plain language states that the recipient of an EUA vaccine must be informed "of the option to accept or refuse the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii). Especially when read against the backdrop of what the Constitution requires and against the common law rules

from which the constitutional protections for informed consent arose, Congress's intent to protect informed consent is pellucid. And Congress "is understood to legislate against a background of commonlaw ... principles," Astoria Fed. Sav. & Loan Assn. v. Solimino, 501 U.S. 104, 108 (1991).

713.     The EUA statute's prohibition on mandating EUA products is reinforced by a corresponding provision that allows the President, in writing, to waive the option of those in the U.S. military to accept or refuse an EUA product if national security so requires. 10 U.S.C. § 1107a(a)(1). That provision would be redundant if consent could be circumvented merely by telling a vaccine recipient that he or she is free to refuse the vaccine but would nonetheless encounter various adverse consequences that violated unconstitutional conditions doctrine.

714.     To circumvent the statutory text about the military waiver, OLC spins out a tortured argument under which the President's waiver would merely deprive military members of their rights to know that they can refuse the EUA product—rather than waiving their rights to actually refuse the product. OLC Op. at 14-15.

715.     Unsurprisingly, OLC's strained reading runs counter the Department of Defense's understanding of this statutory provision. As the OLC Opinion acknowledges, "DOD informs us that it has understood section 1107a to mean that DOD may not require service members to take an EUA product that is subject to the condition regarding the option to refuse, unless the President exercises the waiver authority contained in section 1107a." Id. at 16 (citing DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008)).

716.     OLC even acknowledges that its opinion is belied by the congressional conference report, which also contemplated that 10 U.S.C. § 1107a(a)(1) "would authorize the

President to waive the right of service members to refuse administration of a product if the President determines, in writing, that affording service members the right to refuse a product is not feasible[.]" Id. (quoting H.R. Rep. No. 108-354, at 782 (2003) (Conf. Rep.)).

717.     Unlike OLC, this Court must not ignore the plain statutory prohibition on mandating EUA products. Though released to much fanfare in the media, the Court should discount the severely flawed OLC Opinion in its entirety, affording it no weight in this litigation.

718.     Just as Congress prohibited the federal government from mandating EUA products, the state governments cannot do so, for the Supremacy Clause dictates that the EUA statute must prevail over conflicting state law or policy.

719.     Defendants' Policy is thus preempted by federal law. See U.S. Const. art. VI, cl. 2; see also Kindred Nursing Ctrs. Ltd P'ship v. Clark, 137 S. Ct. 1421 (2017) (holding that Federal Arbitration Act preempted incompatible state rule); Hughes v. Talen Energy Marketing, LLC, 136 S. Ct. 1288, 1297 (2016) ("federal law preempts contrary state law," so "where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" the state law cannot survive).

720.     Defendants' Policy is invalid pursuant to Article VI, Cl. 2 of the United States Constitution, and must be enjoined and set aside.

### XVIII. NUREMBERG CODE OF 1947

721.     The right to avoid the imposition of human experimentation is fundamental, rooted in the Nuremberg Code of 1947, has been ratified by the 1964 Declaration of Helsinki and further codified in the United States Code of Federal Regulations. In addition to the United

104

States regarding itself as bound by these provisions, these principles were adopted by the FDA in its regulations requiring the informed consent of human subjects for medical research. It is unlawful to conduct medical research, even in the case of an emergency, unless steps are taken to secure informed consent of all participants.

### XIX.  28 U.S.C § 1983 CLAIM

722.     Defendants' conduct as described in the Complaint supports a claim under Section 28 U.S.C. § 1983.

### XX.  O.R.C. 2923.32 ENGAGING IN A PATTERN OF CORRUPT ACTIVITY; FINES; PENALTIES; FORFEITURE; RECORDS AND REPORTS; THIRD-PARTY CLAIMS TO PROPERTY SUBJECT TO FORFEITURE (State RICO)

723.     Plaintiff incorporates by reference all the preceding paragraphs into these counts for all purposes.

724.     Pursuant to, O.R.C 2923.32 (A),

(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

(2) No person, through a pattern of corrupt activity or the collection of an unlawful debt, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.

(3) No person, who knowingly has received any proceeds derived, directly or indirectly, from a pattern of corrupt activity or the collection of any unlawful debt, shall use or invest, directly or indirectly, any part of those proceeds, or any proceeds derived from the use or investment of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

725.     Ohio Rev. Code Ann. § 2923.32 (West)

726.     The Ohio Revised Code goes on to state that "Person," is defined as, "(G) "Person"
means any person, as defined in section 1.59 of the Revised Code, and any governmental
officer, employee, or entity." Ohio Rev. Code Ann. § 2923.31 (West)

727.     Defendants are authorized to transact business and perform medical services in the
State of Ohio.

728.     Defendants would be considered an entity and according to the Ohio Revised Code
definition of a person.

729.     The Ohio Revised Code also states that,
(C) "Enterprise" includes any individual, sole proprietorship, partnership, limited
partnership, corporation, trust, union, government agency, or other legal entity, or any
organization, association, or group of persons associated in fact although not a legal
entity. "Enterprise" includes illicit as well as licit enterprises.
Ohio Rev. Code Ann. § 2923.31 (West)

730.     Defendants are an Ohio non-profit corporation and or association that was and is
licensed to and did in fact provide medical services for revenues and large amounts of
federal and state funds in the State of Ohio.

731.     Defendants are, therefore, an enterprise per the definition.

732.     Defendants are required to accurately collect and report healthcare data to federal
and state authorities, including data regarding and involving Co-Vid19.

733.     Defendants did on multiple occasions intentionally report falsified data regarding
Co-Vid19, including numbers of patients, deaths of patients, adverse effects of vaccines
and other medical treatments and did so with the intent to deceive the public and to maintain

a federal revenue stream from the United States and Ohio governments and its agencies. False reporting includes under reporting, minimizing, and mischaracterizing data.

734.     Defendants' actions constituted fraud, false statements, forgery, coercion, and perjury as defined by state and federal criminal statutes.

735.     Defendants through the fraudulent and deceptive reporting practices continued to receive federal and state funds from federal and state agencies, including research grants, Medi-care and Medicaid payments, and other federal funds. This corrupt practice started on or about November 2020 and continues to the present day.

736.     Therefore, the conduct of Hospital involves the commission of two or more specifically prohibited state or federal criminal offenses: healthcare fraud (18 U.S.C. 1347), false statements relating to healthcare matters (18 U.S.C. 1035), insurance fraud (R.C. 2913.47), Medicaid fraud (R.C. 2913.40), telecommunications fraud (R.C. 2913.05), and theft by deception (R.C. 2913.01). The prohibited criminal conduct of the defendant constitutes a pattern; and the defendants have participated in the affairs of an enterprise or have acquired and maintained an interest in or control of an enterprise.

737.     A civil cause of action for personal and other injuries caused by violations of O.R.C. 2923.32(A) is authorized by Ohio law in O.R.C. 2307.60 and *Kaforey v. Jacobson*, 149 Ohio St.3d 398 (2016). Plaintiff suffered personal and other injuries as a direct and proximate result of the defendant's actions described in this Count. Also, as direct and proximate results of Defendants' actions in this Count, Plaintiff suffered all damages sought in the Prayer for Relief.

## XXI.  ATTORNEYS FEES

738.      Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

739.      Plaintiffs request this Court award them their reasonable and necessary attorney fees and costs incurred in prosecuting this action.

**WHEREFORE**, Plaintiffs respectfully request that the court:

1. A declaratory judgment that each of Defendants' Policy infringes upon Plaintiffs constitutionally protected rights to protect their bodily integrity and to refuse unnecessary medical treatment;

2. Judgment in favor of Plaintiffs and an award to Plaintiffs of compensatory, all actual, exemplary, special, and statutory, treble and consequential, damages, including interest, in an amount to be proven at trial;

3. A declaratory judgment that each of Defendants' Policy is invalid under 21 U.S. Code § 360bbb-3, Section (e)(1)(A);

4. A declaratory judgment that each of Defendants' Policy is in violation of public policy;

5. An award of their reasonable and necessary attorneys' fees and costs incurred in prosecuting this action; and

6. Schedule this matter for a temporary injunction hearing enjoining the Defendants from terminating, demoting, or taking any negative action against Plaintiffs for refusing to take a mandatory vaccine and any other relief to which the Plaintiffs may show themselves entitled.

7. All other review to which they are entitled, including a jury trial.

Respectfully submitted,

Glenn D. Feagan (#0041520)
Deters Law
5247 Madison Pike
Independence, Kentucky 41051
gfeagan@feaganlaw.com

## JURY DEMAND

Plaintiff makes a demand for a jury under all claims.

Glenn D. Feagan (#0041520)

## VERIFICATION

Counsel signs this under oath to verify it in support of injunctive relief.

Glenn D. Feagan (#0041520)

## NOTARY

Sworn to and subscribed before me, by _Glenn D. Feagan_ this 23rd day of August 2021.

JENNIFER FEAGAN
NOTARY PUBLIC, STATE OF OHIO
LORAIN COUNTY
My Comm. Expires Jan. 09, 2023

Notary Public
My Comm. Exp. 1/9/2023

_Lorain_ County

State of _Ohio_